**Fredric JERMYN, Appellant,**

v.

**Martin HORN, Pennsylvania Department of Corrections, Commissioner of the Pennsylvania Department of Corrections; Ben Varner, Superintendent State Correctional Institution at Greene; Charles H. Zimmerman, Superintendent, State Correctional Institution at Waymart; Joseph P. Mazurkiewicz, Superintendent, State Correctional Institution at Rockview.**

**Fredric Jermyn,**

v.

**Martin Horn, Pennsylvania Department of Corrections, Commissioner of the Pennsylvania Department of Corrections; Ben Varner, Superintendent State Correctional Institution at Greene; Charles Zimmerman, Superintendent, State Correctional Institution at Waymart; Joseph P. Mazurkiewicz, Superintendent, State Correctional Institution at Rockview, Appellants.**

---

Nos. 98–9012, 98–9013.

United States Court of Appeals,
Third Circuit.

Argued Aug. 16, 2000.

Filed Sept. 21, 2001.

Billy H. Nolas, (Argued), Robert B. Dunham, David W. Wycoff, Michael Wiseman, Defender Association of Philadelphia, Philadelphia, PA, Counsel for Appellant/Cross–Appellee Frederic J. Jermyn.

Marianne K. Fogelsanger, Amy Zapp, (Argued), Office of Attorney General Of Pennsylvania, Department of Justice, Harrisburg, PA, Counsel for Appellees/Cross–Appellants Martin Horn, Pennsylvania Department of Corrections, Commissioner of the Pennsylvania Department of Corrections; Ben Varner, Superintendent State Correctional Institution at Greene; Charles Zimmerman, Superintendent, State Correctional Institution at Waymart; Joseph P. Mazurkiewicz, Superintendent, State Correctional Institution at Rockview.

Before SLOVITER, RENDELL, and STAPLETON, Circuit Judges.

## OPINION OF THE COURT

RENDELL, Circuit Judge:

In August of 1985, a Pennsylvania jury convicted Fredric Jermyn of the murder of his mother, and sentenced him to death. In his habeas petition, Jermyn raises numerous claims, focusing upon his history of mental illness, his trial counsel's self-professed ineffective representation, and the gulf between the evidence presented at trial and the evidence presented at a hearing conducted in 1995 as part of Jermyn's state court pursuit of collateral relief ("PCRA"). At his PCRA hearing, several lay and expert witnesses described the horrible physical and mental abuse Jermyn suffered as a child at the hands of his father, the impact this abuse had on his adult life and his mental illness, and the role his mother played in the household.

Reviewing the fourteen claims Jermyn presented as part of his federal habeas petition, the District Court granted him penalty-phase relief requiring the Commonwealth to provide Jermyn with a new

penalty-phase hearing, or to sentence him to life imprisonment. Jermyn appeals, asking that we overturn his conviction. The Commonwealth cross-appeals, arguing that the District Court erred in granting a new penalty-phase hearing.

After considering all the arguments presented, we conclude that the District Court properly denied Jermyn's claims challenging the validity of his conviction. Jermyn has not demonstrated that the Pennsylvania courts' adjudication of Jermyn's guilt-phase claims "resulted in a decision that was contrary to, or an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court," or "was based on an unreasonable determination of the facts in light of the evidence presented...." 28 U.S.C. § 2254(d). Thus, we will deny Jermyn relief on his appeal insofar as he sought a new trial on the issue of his guilt. While we will affirm the District Court's disposition of those guilt-phase claims essentially for the reasons set forth in its exhaustive opinion in this matter, see *Jermyn v. Horn*, 1998 WL 754567 (M.D.Pa. Oct.27, 1998), we will address three of the guilt-phase claims that present more complex issues and therefore require discussion. Specifically, we will consider: (1) whether trial counsel was ineffective in presenting Jermyn's insanity defense; (2) whether trial counsel was ineffective in failing to request a competency hearing or evaluation; and (3) whether Jermyn's due process rights were violated by the trial court's permitting him to be tried while incompetent, and its failure to order a competency evaluation or hearing on its own motion.

We also will deny the Commonwealth's cross-appeal, as we agree with the District Court's conclusion that Jermyn is entitled to a new penalty hearing based upon his claim that his counsel was ineffective during the penalty phase of his trial, although

our reasoning differs from that of the District Court. Accordingly, we will affirm the District Court's judgment in all respects.

## I.

### A. *The Murder*

On the afternoon of January 1, 1985, police found Jermyn's mother dead in her bedroom. The door to her bedroom was locked from the inside and the police used a screwdriver to enter. The police came to the house after Jermyn called complaining of a "stink" coming from his mother's room. An autopsy revealed that Jermyn's mother had been beaten unconscious, but had died from smoke inhalation from her mattress which had been set afire.

For many years before the murder, beginning after the death of his father, Jermyn had lived with his mother. He was diagnosed by the Veterans' Administration ("V.A.") in 1976 as a paranoid schizophrenic, and accordingly disabled. The V.A. paid him benefits, although at times Jermyn was employed and owned his own small business. Towards the end of 1984, Jermyn's relationship with his mother deteriorated. Later evidence suggests that the relationship deteriorated in part because Jermyn failed to take his anti-psychotic medication, which had been consistently prescribed for him. See *Commonwealth v. Jermyn*, 15 Crim. 1985, slip op. at 26 (Pa. Ct. Common Pleas Jan. 4, 1996) (hereinafter "PCRA Op.").

As a result of their deteriorating relationship, Jermyn's mother revoked her will so that it no longer named Jermyn as her sole heir and executor. The new will bequeathed her house and her estate to her niece, Sharon Isralow, unless she chose not live in the house and Jermyn's mother died from natural causes. In that case, Jermyn

was entitled to half the proceeds from the sale of the home.

## B. *Pretrial Proceedings*

We will recount portions of the pretrial proceedings in detail because they are relevant to Jermyn's claim that counsel was ineffective for failing to seek a competency evaluation or hearing, and his claim that the trial court violated his right to a fair trial in failing to order a hearing on its own motion. After the murder, Jermyn was arrested on January 4, 1985, and taken into custody. Before being arrested, he was interrogated by the Police. On one occasion, a Police officer insinuated that Jermyn had killed his mother. According to the testimony the officer gave at trial, Jermyn responded: "Well, if you feel froggy go ahead and arrest me." While in pre-trial custody, Jermyn, who is diabetic, refused to take his medication, and the trial court signed three orders for involuntary medical treatment to test his blood sugar levels. App. at 26–28.

Jermyn's first attorney was Edward Guido, Esq. of the Cumberland County Public Defender's Office. After the Commonwealth filed a notice of its intent to seek the death penalty, Guido noticed an insanity defense, and listed an individual named John Hume, M.D., as a potential witness who could be called testify on the issue of Jermyn's sanity at the time of the crime. Trial Tr. V.1, at 209a. The following day, April 10, 1985, Guido filed a motion for a continuance because "the defendant has retained Dr. John M. Hume to assist in the preparation of a potential psychiatric defense," but "[t]o date, no psychiatric evaluation has been conducted on the defendant *to specifically determine whether the defendant is competent to stand trial*, or to specifically determine whether the defendant was criminally responsible for the commission of the crimes charged." *Id.* at 213–14a (emphasis added). The trial court granted the continuance. *Id.* at 225a. During the same time period, Cumberland County filed a motion to vacate Guido's appointment because Jermyn had sufficient funds to pay for his own defense, and the Court granted that motion on May 7, 1985. Jermyn acted *pro se* for approximately one month.

On or about June 11, 1985, Jermyn retained Gary Lysaght, Esq., the attorney who represented Jermyn at trial and whose ineffectiveness is at issue before us. On June 14, 1985, Lysaght filed a supplemental notice of an insanity defense, but the second notice did not include Dr. Hume's name as an individual who might be called to testify. It did, however, list Paul Phillips, M.D., who eventually evaluated Jermyn on the issue of his insanity and testified on his behalf during the guilt phase of his trial.

In July 1985, Lysaght filed a motion seeking dismissal of the criminal complaint pursuant to Pa. R.Crim. P. 1100, claiming that Jermyn's right to trial within 180 days of the complaint had been violated. At a hearing on the motion, Guido testified as to the reasons for the delay, and in particular, the reason that he sought a continuance in April. During the hearing, the following exchange occurred between Lysaght (the examiner) and Guido (the witness):

Q. Mr. Guido, I believe you became involved in the case somewhere around January 8, 1985. At that time is it fair to say that you had requested Dr. Hume to perform some kind of initial comprehensive psychiatric examination during the month of January, and in fact he did conduct such an examination and relay that to you? Is that a fair statement?

A. That's correct. Although I would indicate that Dr. Hume did not feel that he could form any opinion on the basis of just one meeting with Mr. Jermyn and felt that additional meetings would be necessary.

Q. Now did Dr. Hume at that time cause you to believe through such an examination that Frederic Jermyn was in fact competent to stand trial?

A. I think that what Dr. Hume gave to me would be privileged on behalf of my client, and I am wondering if Mr. Jermyn is willing to waive that privilege right now. I am not sure I am at liberty to answer that.

Q. Was Frederic Jermyn ever judicially adjudged to be incompetent to stand trial.

A. Not that I am aware of.

Q. Now sir, between January 16 and April 17 was there any further correspondence between you and Dr. Hume?

A. I believe there was no correspondence. There was substantial telephone contact where I attempted to reach him. He was a very difficult man to reach during that period of time.

Q. Now on April 17th, one day after your request for a continuance ...

A. It was one week after my request. My request was made April 10th.

Q. Excuse me, one day after the hearing on your motion for continuance, you then sent another letter to Dr. Hume requesting him to perform more testing, is that correct?

A. I would have to check my file. That sounds correct. I may have also told him or I should have told him that the case was continued. (Attorney Lysaght gives Mr. Guido paper to examine.) That's correct.

Q. So on April 17th, one day after the hearing on your continuance, you sent a letter to Dr. Hume requesting more of an examination of your client.

A. That's correct, only because he had not been responding to my telephone request to him to get up to see Mr. Jermyn, and, as I recall, I think you would have to have Dr. Hume here, as I recall, he or his office informed me that he would not be available during the week of April 29th, if I am not mistaken. I may be mistaken on that. And Dr. Hume and I did meet in my office, we did meet in my office on 'one occasion I believe before April 17th, because I was taken off the case shortly after April 17th, so it would have to have been before April 17th.

. . . .

Q. Now is it true that Dr. Hume again saw Frederic Jermyn on the 24th of April to perform yet another examination at your request.

A. That's my understanding. With a follow-up report not reaching me until the 21st of May.

Trial Tr. V.1, at 339–41a. Thus, the record reflects the fact that Dr. Hume evaluated Jermyn prior to trial to determine his competency to stand trial and his sanity, and it also confirms that Guido had received at least one written report from Hume that presumably addressed those issues.[1] Ultimately, the Court denied the

---

1. The actual report was not made part of the record during any of the state direct or collateral proceedings, and it is not found in the record made before the District Court. Moreover, our review of the entire trial record indicates that the trial court was not made

motion to dismiss pursuant to Rule 1100, and the matter proceeded to trial.

## C. *The Trial*

The trial began in August. The prosecution presented testimony for one and a half days. The defense case lasted a little more than three hours. The entire penalty phase, including evidence, closing arguments and the jury charge took less that two hours, including a twenty minute recess.

During the guilt phase, the Commonwealth connected the bruises on Jermyn's mother's body to a studded armband Jermyn had been seen wearing on the night of December 31, 1984, the night before his mother was found dead, and provided expert testimony to prove that her bed had been set on fire intentionally. The Commonwealth contended that the new will, and the decision to evict Jermyn, was Jermyn's motive for murder, and also presented two witness who testified that Jermyn told them that he had killed his mother. According to Eugene Gramm, Jermyn had talked of his intention to kill his mother after receiving the eviction notice, and the day after her murder had tried to tell him that he had killed her. Dean Barnes, whom Jermyn met in prison, testified that Jermyn told him that he was glad he "torched that bitch." Barnes also testified that Jermyn told him that he intended to support his insanity defense by telling the jury that his mother came from satan, and by reading a poem to the jury. The Commonwealth entered the poem into the record.[2]

aware of the contents of that report at any time prior to, during, or after trial.

**2.** The following is the poem introduced at trial by the Commonwealth through Barnes:

I AIN'T CRAZY I'M FOR REAL.
AS I CONTROL THE FATE AND DESTINY OF ALL MANKIND
IT FALLS ON ME TO DETERMINE WHO GETS PEACE OF MIND,
WHO GOES TO HELL OR TO HEAVEN OF LIVES LIFE WITH LUCK.
SO PLAY IT COOL. DON'T BE A FOOL. I LOVE TO PLAY FUCK–FUCK.
YES, SCREW WITH ME AND YOU WILL FIND YOURSELF IN DIRE STRAITS.
JUST LIKE MY GOD–DAMNED MOTHER WHO DIDN'T MAKE THE PEARLY GATES
ITS JUST THE WAY THE BIBLE SAYS. THE FATHER OF ALL LIES
IS SATAN A.K.A. MY MOM. IN HELL I HOPE SHE FRIES.
I WAS NEVER REALLY BORN. GOD CREATED ME,
PUT ME HERE AND HAD ME RAISED BY SATAN JUST TO SEE
WHO I'D CLING TO, GOD OR DEVIL. THE CHOICE WAS MINE TO MAKE.
THE WAY THE WORLD IS GOING ... I'VE NOT DECIDED WHICH TO TAKE.
I THINK I MIGHT HAVE FOUND ONE MAN CAPABLE OF LOVE
FOR OTHERS OTHER THAN HIS OWN AND MAY THE LORD ABOVE
ENHANCE HIS FEELINGS TO INCLUDE ALL HUMANITY.
FOR WITH ALL CHANCES LIE. OR ARMAGEDDON IT WILL BE!
I ALONE KNOW THE TRICK OF MORTAL PALE.
IF YOU TRY TO ON YOUR OWN, KNOW YOU'RE GOING TO FAIL.
ALL PHILOSOPHIES TO DATE PROPOSE WHAT I COULD TEACH.
I'VE EARTH BY THE ASS WITH A DOWNHILL DRAG. NO NEED FOR ME TO PREACH.
YOU ALL KNOW BASICALLY WHAT YOU WANT IN
THE AFTERLIFE.
UNENDING LOVE. PEACE. GOODWILL. A PLACE THAT'S FREE FROM STRIFE.
THE POSSIBILITY INDEED EXISTS. THERE IS JUST SUCH A PLACE.
IT'S CUSTOM–MADE, SPECIFICALLY DESIGNED FOR ALL THE HUMAN RACE.
TO GET THERE ALL YOU HAVE TO DO IS PROVE YOUR WORTH TO ME.
THAT MEANS NO CON. NO SHUCK AND JIVE. NOT FAST REPARTEE.
WHAT'S WORTHY IS THE LOVE YOU HAVE INSIDE YOUR HEART AND SOUL.
I WILL TEST IT. I WILL JUDGE. FOR I CAN MAKE YOU WHOLE.

Jermyn's unsuccessful defense was based on two arguments. Counsel contended that Jermyn's mother, a heavy smoker, had accidentally started the fire while Jermyn was out on New Year's Eve. He argued, in the alternative, that if Jermyn had killed her, he had been insane at the time. Jermyn put on seven witnesses in support of his two defenses. The first witness, William McBride, supported the accidental death theory, and testified briefly that people do set fire to their bed by smoking. Trial Tr. V.2, at 678a–682a. The second and third witnesses, Richard Rosario and Rhonda Sue Fettrow, testified in aid of impeaching the credibility of Gramm and Barnes. Id. at 683a–693a.

The fourth witness was Gloria Seilor, a friend of Jermyn's whom he thought of as his girlfriend. Seilor testified briefly about Jermyn's "odd" beliefs and "odd" poetry. According to Seilor, Jermyn was not "normal." For example, Seilor explained that Jermyn believed he was Jupiter, the Roman god, while she was Juno, Jupiter's wife, and that he thought he had supreme or supernatural powers. Id. at 693a–703a.

The defense called Reverend Falk as Jermyn's fifth witness. On direct examination, Reverend Falk began by explaining that he knew Jermyn as a friend during the third, fourth and fifth grades. See id. at 704a. Their friendship ended when Jermyn left home to attend the Scotland School in about the eighth grade. Falk explained that Jermyn was sent away to school because he had gotten into trouble for bringing pornographic pictures to school, and hypothesized that Jermyn was sent away because "Mildred was having a hard time handling him with Fred, Senior's physical situation being what it was." Id. at 708a.

Jermyn's counsel asked Reverend Falk whether Jermyn's childhood had been "unusual" in any way. Falk answered, explaining the Jermyn had seemed rejected, and had spent a lot of time in his room. Falk also testified that Jermyn's father was "kind of scary" but that Falk was not afraid of him. Id. at 705a. Falk said that he did not feel that Jermyn was "unusual" as a child. Id. Describing Jermyn's relationship with his parents, Falk explained that "[i]t was a constant state of who was going to win any particular argument, or whatever was going on at the house, whose personality was going to prevail, that kind of thing, which was usually his mother." Id. at 706a. Counsel asked Falk about Jermyn's relationship with his father and whether Jermyn's father ever beat or abused Jermyn. Falk answered that "[i]t was a tense relationship with his father and Fred told me that his father beat him, you know, on a weekly basis," id. at 707a, and also explained that he had seen marks on Jermyn's back on two occasions and that Jermyn had pointed out to him what Jermyn's father had used to hit him, see id. at 708a. Falk also testified that for a while, Jermyn did not eat with his parents because "his father was mad at him for some reason." Id. Falk said that he never saw Jermyn's father act violently towards Jermyn. Falk also answered "not around me" when asked by counsel if he was aware of whether Jermyn's father provid-

I CAN CURE YOUR DEEPEST HURT,
HEAL YOUR ACHE, YOUR PAIN.
I CAN DO ANYTHING I WILL, BECAUSE
I AM JERMYN.
ADDENDUM:
IF YOU FEEL I'M CRAZY OR THAT I'M
TO BE LOCKED UP I SUGGEST YOU
RECONSIDER CAUSE YOU CERTAINLY FUCKED UP.
YOU DIDN'T LISTEN TO WHAT I SAID, I
HAVE AN ACE IN THE HOLE.
MOM'S IN HELL BUT I'M CONTROLLING SATAN. DAMN HER SOUL!
Trial Tr. V.3, at 899a–900a.

ed Jermyn with a gun when he was a child. *Id.* at 709a.

On cross-examination, the prosecutor asked Falk whether, "[i]n your role as a pastor, it is uncommon for young children, going through from say fifth grade on until the eighth grade, to fight with their parents?" Falk answered, "I think it's a natural thing for all children to push the limits of the authority of the parent, yeah." *Id.* at 710a. Jermyn's counsel did not ask any questions on redirect.

Dr. Phillips, a psychiatrist, testified next. Lysaght had retained Dr. Phillips to provide his opinion concerning Jermyn's insanity at the time of the offense. While it is not clear from the record the exact date that he was retained, our review of the proceedings confirms that Lysaght contacted him at least by June 14, 1985, about two months before the trial began, because Dr. Phillips was listed in the supplemental insanity notice that Lysaght filed with the court shortly after Jermyn retained his services. Trial Tr. V.1, at 302a–303a.

Dr. Phillips explained that Jermyn was, in his opinion, a chronic paranoid schizophrenic. Dr. Phillips based his diagnosis on a consultation with Jermyn, and the corroboration provided by Jermyn's V.A. records that stretched from 1976 to 1984 and included the records of periodic re-evaluations. Dr. Phillips confirmed that the V.A. records "consistently documented and . . . supported the diagnosis of a chronic paranoid schizophrenia." Trial Tr. V.2, at 715a. Dr. Phillips described the relevant criteria for a diagnosis of paranoid schizophrenia, and noted that Jermyn met each criterion, including a history of hallucinations, delusions, and grandiose thoughts beginning in his mid-twenties. He also provided his opinion that it is difficult to "fake" mental illness to receive V.A. benefits, and reminded the jury again that several V.A. physicians over a period of time had diagnosed him consistently with the disease. *Id.* at 724a–729a. He also confirmed that Jermyn received total disability from the V.A. based on its determination that he was totally unable to work. *Id.* at 725a.

Jermyn's counsel then asked Dr. Phillips whether Jermyn's paranoid schizophrenia meant that Jermyn would have understood the nature and quality of his acts at the time he killed his mother. Dr. Phillips answered that:

> He told me . . . a lot of things, but specific to this question, he told me that at the time of the alleged incident he believed that he, this is a very strange thought, he described himself as the fidget of god. I spelled it F–I–D–G–E–T, and I had to ask him what did he mean by that because I didn't know what a fidget of god is, and he stated that that is, as best as I could understand it, someone who has a very special relationship with God, could be equal to God at sometimes, but that he had these superior powers, he was above earthlings, and that he felt that his mother was the devil and that he was justified in, because he had said he was innocent, and I said innocent means you didn't do anything at all. He said, "Well, there is justifiable homicide if God is killing the devil is essentially what it amounted to."

Trial Tr. V.2, at 728a.

On cross-examination, the prosecutor challenged Dr. Phillips' diagnosis by noting that some psychiatrists consider paranoid schizophrenia to be a "myth," and by suggesting that Jermyn was an highly intelligent individual capable of manifesting the symptoms necessary to receive government benefits for schizophrenia. After Dr. Phillips agreed that Jermyn was an intelligent individual and acknowledged that a leading psychiatric textbook stated that

"some psychiatrists call schizophrenia a myth or metaphor," *id.* at 735a, 752a–61a, Dr. Phillips nevertheless reaffirmed his diagnosis with reference again to the V.A. records. He also restated his opinion that Jermyn could have been legally insane when he killed his mother, noting that "he has the capacity to have times when he seriously can have problems telling what is right and what is wrong. He has the morality at times which is above society." *Id.* at 767a. On cross-examination, Dr. Phillips also discussed evidence in the V.A. records that Jermyn regularly refused to take his anti-psychotic medication. *Id.* at 759a, 762a.

During cross-examination, the Commonwealth also asked Dr. Phillips what sources of information he used in forming his opinion as to Jermyn's mental illness. The following exchange took place:

Q. Is there anything else—well specifically . . .

A. No, that's a good question. There were other things, I did have some other reports, in particular there was a psychiatric report by Dr. Hasselbacher who saw Mr. Jermyn for a social security evaluation that was part of the records. That occurred, I believe, sometime in 1983. And I also saw a report from Dr. John Hume who was, I believe, requested by the defense to see him [Jermyn] for the question of competency to stand trial. I may be overlooking something, but I had a lot of records.

. . . .

Q. So at least with regard to this case, you know Dr. Hume, a psychiatrist, saw the defendant, and you did get a report from him, and that was whether or not he was competent to stand trial.

A. That was the primary goal of the report, yes.

Trial Tr. V.2, at 739–740a.

On redirect examination, Dr. Phillips agreed with counsel that at least "eight to ten" mental health professionals diagnosed Jermyn with a psychosis rather than a mere personality disorder, and conveyed again that it was difficult to "fake" psychosis in order to receive disability benefits from the V.A. *Id.* at 772a. Counsel did not ask Dr. Phillips to explain specific entries in the V.A. records that supported his diagnosis, and he did not attempt to rebut the assertion that schizophrenia is a myth and not a real disease. He also did not make any reference to Dr. Hume's report.

Additionally, throughout Dr. Phillips' testimony, Jermyn's counsel did not ask him any questions about Jermyn's childhood, even though counsel knew that Dr. Phillips had discussed those matters with Jermyn prior to trial. On cross-examination, the prosecution asked Dr. Phillips whether he chronically violated rules at home, and Dr. Phillips testified: "My understanding is he was a difficult child." *Id.* at 764a.

Jermyn took the stand as the last witness in his defense. He answered a few foundational questions before his counsel asked him whether "this experience" had been stressful. *Id.* at 781a. Jermyn answered "No." *Id.* Counsel asked whether the experience caused him to write some poetry. Jermyn answered "Yes," and counsel invited Jermyn to read the poetry to the jury. The Commonwealth objected, and the objection was sustained. *Id.* Trial counsel rested, and the court instructed the jury to ignore Jermyn's testimony in whole. The defense's entire presentation lasted a little more than three hours. That evening, the jury found Jermyn guilty of murder. *See id.* at 888. The penalty phase took place the next morning.

During the sentencing phase, the Commonwealth relied upon the evidence presented during the guilt phase, and presented only a closing argument. Jermyn's counsel recalled Seilor, presented Scott Spraglin, a Cumberland County Prison official, and entered Jermyn's V.A. records into evidence accompanied by an index prepared by counsel. Both witnesses testified that Jermyn should not be sentenced to death because he would be a positive member of the prison population. Seilor added to her prior testimony, discussing Jermyn's relationship with his mother; "in some ways I thought there was a closeness, although they said they didn't speak." Trial Tr. V.3, at 1075a.

Jermyn also spoke to the jury, and voluntarily read a poem to the jurors.

Well, I see that you have decided that I am insane,

That or guilty doesn't matter, but you must make plain which it is.

In the future you must make a choice,

What you want to listen to, mine or Satan's voice.

I killed Satan, I admit that, so is that a crime?

Earth it is, live with it all through the rest of time.

You, in essence, are admitting you prefer his ways over God's.

If that is so, no need for you to pray.

If, on the other hand, you find that I am insane,

I judge that your society is actually insane.

It never dawned on you that I might really be the way I really am

And truth is just exactly what I say.

Did you ever stop to think from where all mankind originates,

That one of you might think on this and try to tell you straight.

Of course not.

So what have you, war, disease and pain and fear,

And enjoy them people.

Enjoy them, people.

I could help, but you don't want to hear.

Destroy each other.

Though I care, you've made it clear that you don't care for God or any arts of Him, you don't care.

Trial Tr. V.3, at 1085a–1086a.

In closing arguments, Jermyn's trial counsel reminded the jury of the evidence of Jermyn's mental illness. The great majority of his argument, however, focused upon Jermyn's childhood, the lack of love he received from his parents, and the strange relationship that grew between Jermyn and his mother.

Fred Jermyn and his parents, from the time he was a small child, never got along. There was never love in that family. You have heard about his father when he was five beating him as a child, you heard about his mother. Ladies and gentlemen, Fred was sent away from his home when he was thirteen years old to the Scotland School for boys because his parents did not want to cope with him. They had their own lives and their own problems.

. . . .

His father took a loaded 38 pistol one time and said to Fred, right before Fred was thirteen years old, his father took a loaded 38 pistol and gave it to Fred and said, "Here, Fred, blow your brains out." His mother made many statements to him as a child, "Fred, why don't you just kill me now," but yet Mrs. Jermyn lived with her son, that strange relationship, for all those years, ever since 1976, they would live in the same house together and only one time did she ever try to kick her son out of the

house. That relationship had to be something that you and I will never understand.

*Id.* at 1089a.

Here we have a situation where two people who don't get along but yet they live together for all this time, a mother who has rejected her son at the age of thirteen, a mother who has always been afraid of her husband, a mother who cannot understand her son, a mother who always expected too much of her son, and a son who was hard to love to begin with because of whatever reason.

*Id.* at 1090a.

There is no excuse for murder. But if a child is abused, if a child is unloved, if a child is being rejected, once again, by his mother, thirteen years old, even if that is the most errant child in the world, even if the child deserves discipline, there is discipline and there is direction that don't exceed our common bounds of decency.

*Id.* at 1092a.

When your mother kicks you out of the house when you are a young kid, when your mother beats you or acquiesces to beating, your mother yells at you so she doesn't get yelled at by her husband who is a drunk. Ladies and gentlemen, ... when you consider his upbringing, when you consider what his mother did to him when he was young, when you consider that his mother all of a sudden does the same thing she did to Fred Jermyn when Fred was thirteen, she said, "Get out of the house and go away," when you consider what [e]ffect that might have had on this brain at the time, it's mitigating, its quite possible, and it's probable that that was too close, that struck too close to the core of what

Fred Jermyn was and Fred Jermyn had to fight within himself for his whole life.

*Id.* at 1093–1094a.

In closing, the prosecutor—as had been a theme in his questioning—argued that Jermyn had faked the symptoms of mental illness. The prosecutor also attacked counsel's effort to blame Jermyn's mother, and told the jury there was no evidence of the incident with the gun.

Now one interesting thing we heard a comment this morning about some incident with the 38. Now would that have been something that psychiatrists would have wanted to know, an important event in this man's life? Well I've read this book [the V.A. records] and I have looked at these documents, you read it and you see where that inference is or why it just surfaced today, or is that just another one of the things that has come from his mouth to justify what he did.

*Id.* at 1103a.

The court instructed the jury, reminding them that they were the factfinders and should ignore what the court and counsel had told them about the facts if they recalled the facts differently. The jury found one aggravating factor, namely, that the murder had been committed while Jermyn was also committing a second felony, arson endangering persons. The prosecution stipulated to one mitigating factor: that Jermyn had no significant history of prior criminal convictions. The jury found two other mitigating factors: that the defendant was under the influence of extreme mental or emotional disturbance, and that there was other mitigating evidence of the character and record of the defendant and the circumstances of the offense. The jury sentenced Jermyn to death. *See id.* at 1113–14. Jermyn's conviction was upheld on direct review by the Pennsylvania Supreme Court. *See Com-*

*monwealth v. Jermyn,* 516 Pa. 460, 533 A.2d 74 (1987).

### D. *Collateral Proceedings*

The procedural history of Jermyn's appeal is ably described by the District Court. *Jermyn v. Horn,* 1998 WL 754567, at * 1–4. In brief, his direct appeals were denied, and he proceeded to seek collateral relief, which was ultimately denied by the Pennsylvania Supreme Court on his second PCRA petition in 1998, thereby exhausting his state remedies. *Commonwealth v. Jermyn,* 551 Pa. 96, 709 A.2d 849 (1998).

An evidentiary hearing on Jermyn's second PCRA petition was held by the original trial court in 1995. Jermyn presented eight witnesses: Sharon Isralow, his cousin and the beneficiary under his mother's will; Sharon's mother, Esther Isralow; Jermyn's trial lawyer, Gary Lysaght, Esq.; the lawyer's trial investigator, Nicholas Ressetter; Dr. Phillips; and three clinical psychologists. The Commonwealth did not present any testimony or evidence, which the PCRA court explained was "not surprising given the credibility of the Isralows and the experts." PCRA Op. at 30. The court limited the hearing to evidence supporting Jermyn's claim that his counsel had been ineffective at sentencing for failing to investigate and present evidence of his childhood.

The Isralows testified about extraordinary abuse perpetrated by Jermyn's father, including beatings, the constant threat of beatings, and other emotional abuse. Sharon Isralow told the PCRA court that Jermyn's father used to beat him with a cat-o'-nine tails, a steel crutch, and his hands. She also testified that Jermyn's father showed him no affection, and eventually banished him from his presence. The family would use the kitchen door to enter the house, but Jermyn would

have to come in the front door and immediately go up the stairs to an attic room to avoid confrontation with his father. He was not permitted to eat meals with his father. On occasion when Sharon Isralow and her mother came to visit, and Jermyn was in the fifth or sixth grade, he was chained to a dog leash near a red dog-food bowl that had human food in it.

According to Sharon Isralow, Jermyn did not provoke his father's behavior. He was "helpless and out of control in that situation." Eventually, Jermyn's relationship with his father deteriorated to the point that Jermyn's mother placed him in the Scotland School, a residential school for "orphans" or "unwanted children," to get Jermyn out of the family home. Jermyn's father did not visit him at the school, and his father died while Jermyn was living there.

The PCRA court's opinion described the content and credibility of the Isralows' testimony:

> [Sharon] Isralow, who works for the United States State Department, is an intelligent, sensitive and credible witness. She testified to personal knowledge that petitioner's father was a mean, cruel, vicious, intimidating bully who hated petitioner. On many occasions she observed the father's degrading and humiliating treatment of his son. She never saw the father show any affection to his son. Isralow's testimony is replete with her recollections of specific incidents showing horrendous mistreatment and abuse of petitioner by his father. Decedent, while generally protective of her son, was unable to protect him from his father's fury. In 1962, when petitioner was 14, decedent arranged for him to enter the residential Scotland School for Veterans' Children in Franklin County, Pennsylvania. Petitioner never saw his father again. Peti-

tioner lived at the Scotland School until he graduated in 1967. From 1962 when he entered the Scotland School, until his father died in the late 1960's, petitioner never went home. However, his mother did visit him at the school.

Isralow's perception was that petitioner was the lighting [sic] rod for his father's cruelty, and that his mother was worn down and unable to protect him when he was in the father's presence. When he was younger she observed that petitioner was withdrawn. As he got older he was delusional, and his conduct became bizarre. He became dysfunctional, reclusive and unproductive. Isralow visited petitioner at the Scotland School and later lived with petitioner and his mother for a year in 1974 before she graduated from college. She kept in contact with her aunt thereafter, and was aware that petitioner kept his mother's house in shambles. As the years passed, Isralow observed that petitioner's conduct become more bizarre, cold, and calculating. He became more delusional. The testimony was supported by Esther Isralow, age 80, the mother of Sharon Isralow, who was also a credible witness. Esther Isralow was aware that her sister was unable to protect petitioner from her husband's abuse. She testified that her sister tried to appease her husband, but that it never changed his conduct towards his son.

PCRA Op. at 25.

The Scotland School records corroborate the Isralows' discussion of Jermyn's home life, and, in fact, Jermyn's counsel's closing arguments during the penalty phase of Jermyn's trial. A report written in June 1962, explains: "His wife [Jermyn's mother], who is much older than he is, (in fact

looks more like his mother) is a pathetic figure. She and the boy are obviously very much afraid of this 'cripple.' She tried to explain his violent temper, and his hatred and mistreatment of the boy tacitly, but was quickly squelched." App. 24. Another letter in the school records explained: "Mrs. Jermyn suffers with this situation. She is torn between loyalty and need for both the father and son but is unable to move away from her husband." *Id.*

Dr. Phillips and other mental health experts testified that Jermyn's childhood experiences were replete with physical and psychological abuse. Several of them opined that this was one of the more severe, if not the most extreme, example of childhood abuse and neglect they had seen. Moreover, all of the experts concluded that Jermyn's childhood experience contributed significantly to his mental illness which they diagnosed as paranoid schizophrenia.[3]

They further agreed that Jermyn's illness impacted upon his thought processes when he killed his mother, and there was testimony to the effect that he was insane at the time. *See, e.g.*, App. 10, at 63, 117, 147. According to Dr. Phillips, Jermyn told him during his initial consultation that his mother was the devil. App. 10, at 20. Nonetheless, he also expressed love for his mother. When asked about that inconsistency, Dr. Phillips explained that "a schizophrenic has the unique-virtually unique capacity to love and hate the same object at the same time." App. 10, at 21.

Dr. Phillips further stated that when he originally evaluated Jermyn for trial, Jermyn told him about his abused childhood, App. 13, at ¶ 4, and he gave Dr. Phillips detailed examples of the physical abuse

---

**3.** The record contains affidavits from seven doctors, including those who testified at the PCRA hearing discussing Jermyn's mental illness at the time of his mother's murder and its relationship to the abuse he suffered. App. 13–19.

that his father had inflicted upon him. Dr. Phillips also testified that he relayed the information he knew about Jermyn's childhood to his counsel, and attempted to explain to him the significance of his childhood in understanding why Jermyn acted the way that he did. According to Dr. Phillips, Jermyn's counsel failed to appreciate the significance of Jermyn's background in explaining his adult behavior, and never questioned him about it. App. 10, at 29; App. 13, at ¶ 13. Nonetheless, Dr. Phillips testified that he expected to be asked at trial about the psychiatric importance of Jermyn's childhood in understanding Jermyn's mental illness and adult behavior, and also to be called to testify during the penalty phase. App. 13, at ¶¶ 15, 22. Dr. Phillips submitted a declaration in the PCRA proceedings in which he stated that "[t]here certainly was overwhelming mitigating evidence about [Jermyn's] childhood physical torture and emotional abuse, and the effects of this background on his overall functioning and mental state as an adult." App. 13, at ¶ 22. However, counsel did not call Dr. Phillips as a witness in the penalty phase, and counsel failed to introduce any mitigating evidence concerning Jermyn's childhood abuse during that portion of the trial.

Jermyn's trial counsel, Gary Lysaght, Esq., also testified at the hearing and filed an affidavit. Lysaght explained that at the time of the trial he was out of law school less than two years, this was his first capital case, and the first case he had tried which involved mental health issues. App. 20, at ¶ 3; App. 9, at 123. He indicated that he did not hire an independent investigator and that he had several other cases and clients that consumed a large amount of his time prior to Jermyn's trial. App. 20, at ¶ 3. He testified that "I was overwhelmed at the time, and that's an accurate assessment of my state of mind and my degree of preparation." App. 9, at 141.

Lysaght testified that, in preparing for trial, he learned that Jermyn was abused during his childhood. He also confirmed that Dr. Phillips tried to discuss with him the significance of his childhood experiences, how they impacted upon Jermyn's adult functioning, and why those experiences mitigated against the imposition of the death penalty. Id. at 151, 709 A.2d 849; App. 20, at ¶¶ 5, 6, 12. However, Lysaght explained in his PCRA affidavit that he "did not pay appropriate attention to what [Dr. Phillips] was telling me." App. 20 at ¶ 5.

Lysaght confirmed that he engaged in "minimal preparation for capital sentencing before the trial." Id. at ¶ 11. He explained that when the guilty verdict came in, he was "devastated," and that he "had no idea how to actually conduct a capital sentencing hearing." Id. Lysaght confirmed that Dr. Phillips had told him prior to trial that he was willing to testify at the penalty phase concerning Jermyn's abusive childhood and its mitigating effects and impact on his adult life. However, as noted, counsel did not call Dr. Phillips as a witness during the penalty phase, and Lysaght admitted that there was no tactical reason for proceeding through the penalty phase without testimony from Dr. Phillips on this issue. App. 9, at 132. According to Lysaght, it was not until the end of the sentencing hearing that he realized the importance of Jermyn's childhood to his defense, which was why he made reference to the problems, as he then knew of them, in his closing argument. App. 20, at ¶ 12. However, he had not presented any evidence of the facts he recited in his closing argument; instead, he offered evidence from people he barely knew, much less prepared. See App. 9, at 132, 135; App. 20, at ¶ 9. He explained that after the

guilty verdict came in, he "scrambled around and put on brief testimony from Seilor and Spraglin." App. 20, at ¶ 11.

Counsel also testified that there was no tactical reason for his failure to investigate Jermyn's childhood, and admitted that he had made no effort to contact any members of Jermyn's family. *Id.* at ¶¶ 7, 10. He confirmed that he knew Sharon Isralow was Jermyn's cousin and the named beneficiary in the victim's will. *Id.* at ¶ 8; App. 9, at 127–28. When counsel later found out the substance of the testimony the Isralows could have provided, he was "shocked," describing it as a "bombshell." App. 9, at 125. Counsel also admitted that he knew that the Scotland School was for "orphans" or "unwanted children," and that Jermyn was sent there by his parents, but did not investigate further or present evidence to that effect. App. 9, at 128–29.

Lysaght's law clerk, Nicholas Ressetter, also testified during the PCRA proceeding, and filed an affidavit. He explained that Jermyn's lawyer and he "lacked direction," and they talked to only a few witnesses including Seilor, Falk and Spraglin. *See* App. 21, at ¶¶ 21–22. He also confirmed that Lysaght had not planned for the penalty phase. Rather, "the verdict came in on a Friday late afternoon, and Gary more or less told me to try and arrange for some mercy witnesses to be there the next morning, Saturday, which I did into the night." App. 9, at 167.

In his PCRA affidavit, Reverend Falk confirmed that Jermyn told him that his father abused him as a child, but that he had no first-hand knowledge of the extent of the abuse. He explained to the PCRA court that he only had one brief conversation with Lysaght or someone from his office before testifying at the trial, and that he indicated at that time that he would not be the best witness about Jermyn's childhood because he could not re-

call all that Jermyn had told him. *See* App. 22, at ¶¶ 5, 6, 9.

On cross-examination, counsel for the Commonwealth asked Jermyn's lawyer whether Jermyn had told him about the childhood abuse. Jermyn's counsel answered, explaining the difficulties he had faced communicating with Jermyn:

> I don't recall, Mr. Eakin. Fred—you do not have—I did not have a normal conversation with Fred Jermyn during the preparation of this trial. If you ever try to have a conversation with him—well, forget that. But it was difficult for me to communicate with Fred given the extent of his problem, let's say. I don't want to characterize it as insanity or mental health.

App. 9, at 154.

On redirect, Jermyn's PCRA counsel asked Jermyn's trial counsel to elaborate.

Q. You indicated you never had a normal conversation with Fred. Was that because of his mental problems?

A. I would not say—perhaps I used a too strong a word.

Q. Yeah.

A. Never is an absolute, but very infrequently during my jailhouse visits to him or during court sessions or during court recesses or in the preparation of this. It was very difficult, if not impossible, for me to have what I would perceive as a logical, orderly, help me out with this, Freddie, type of conversation.

Q. And my question is, was that because of his mental problems?

A. I don't know that I am competent to say whether it was because of his insanity or because he was—

Q. Your perception as a lawyer, you had a client—

A. I had a client that it was extremely difficult for me to relate to and me to join with, bond to, and proceed in an orderly and directional fashion towards our goal of successfully presenting a defense and avoiding the imposition of the death penalty, be it through my inability to relate to him or his inability to relate to me, but, yes, I put it to his mental condition.

Q. That's what I'm getting at. You had VA records that indicated a diagnosis of paranoid schizophrenia?

A. Yeah.

Q. Dr. Phillips told you your client is a paranoid schizophrenic?

A. Yes.

Q. You believed that?

A. I believe that Freddie is severely mentally disturbed if not insane. I don't know whether we are using these terms interchangeably. I don't know whether I can testify to labeling him insane, but I thought he was nuts.

Q. And you saw that yourself when you dealt with him?

A. Yeah, I saw bizarre behavior, whether it was acting out, what caused it, whether it was real, whether it was imagined, whatever, it was very difficult to deal with his behavior because it was abnormal and it was bizarre. And I didn't feel that it was helping me to try and help him, and it was probably because of his mental illness.

App. 9, at 155–57.

The PCRA court denied each of Jermyn's claims, and the Pennsylvania Supreme Court affirmed. On his federal habeas petition, the District Court addressed fourteen separate claims.[4] As we previously mentioned, the District Court denied relief on all of the guilt-phase claims, but granted Jermyn relief pertaining to the penalty phase based on the conclusion that Jermyn's trial counsel had been ineffective for failing to investigate, develop and present mitigating evidence of the history of Jermyn's family relationships and childhood.[5] Subsequently, on December 10, 1998, the District Court entered an order granting Jermyn a certificate of appealability ("CAPP") pertaining to the remaining claims the Court rejected as grounds for habeas relief. See Order of 12/10/98 ("A Certificate of Appealability is issued with respect to Claims II–VII, IX, and XI–XIV"). However, as we have indicated, we will address only three of Jermyn's guilt-phase claims that we believe require further explication. We also will discuss in some detail Jermyn's Sixth Amendment

---

**4.** In addition to the claims Jermyn raises in the instant appeal, and the claims on which the District Court granted penalty-phase relief, Jermyn's petition raised four other claims, which are not at issue in this appeal.

**5.** The Court also granted penalty-phase relief on the grounds that the trial court's instructions raised a possibility that the jurors did not understand that they were to weigh the impact of the one aggravating factor found against *all* of the mitigating factors. It also concluded that the death penalty instruction violated the Eighth Amendment, as interpreted by *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), *McKoy v.*

*North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), and *Frey v. Fulcomer*, 132 F.3d 916 (3d Cir.1997). Although the Commonwealth has filed a cross-appeal challenging those rulings, we need not address them in view of the result we reach on the penalty-phase ineffectiveness claim. The District Court additionally found that Jermyn *would have been entitled to an evidentiary* hearing on his claim that he was denied due process at his hearing in 1995 on the issue of his competency to be executed. Again, because of our grant of penalty-phase relief, we will not address this issue at this juncture.

claim that his attorney was ineffective for failing to present evidence concerning Jermyn's childhood, as the Sixth Amendment claim forms the basis for our grant of a new penalty hearing.

## II.

Before we reach the merits of Jermyn's claims, we must first address the Commonwealth's argument that Jermyn is not entitled to raise those claims at this juncture because they are procedurally barred. The Commonwealth contends that the District Court erred in reaching the merits of Jermyn's claims because the Pennsylvania Supreme Court denied relief on the procedural ground that the claims had been waived under state law and Jermyn had not demonstrated a "miscarriage of justice" that excused the waiver. The Commonwealth maintains that the Pennsylvania Supreme Court's application of the miscarriage of justice standard to Jermyn's claims provides us with an adequate and independent state ground to deny federal habeas relief.[6] *See Johnson v. Mississippi*, 486 U.S. 578, 588–89, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988).

■ The Commonwealth's argument is grounded on the principles of waiver and procedural default. To be eligible for relief under the PCRA, the petitioner must plead and prove, *inter alia*, that the claims raised in the PCRA petition have "not been previously litigated or waived." 42 Pa. Cons.Stat. Ann. § 9543(a)(3). Because an issue is waived under the PCRA "if the petitioner could have raised it but failed to do so ... in a prior state post-conviction proceeding," *id.* § 9544(b), Pennsylvania courts will not address the merits of a claim that is presented in a second or subsequent petition for post-conviction relief "unless a strong prima facie showing is offered to demonstrate that a miscarriage of justice may have occurred." *Commonwealth v. Jermyn*, 709 A.2d at 855–56 (quoting and citing *Commonwealth v. Szuchon*, 534 Pa. 483, 633 A.2d 1098, 1099 (1993)); *Commonwealth v. Lawson*, 519 Pa. 504, 549 A.2d 107, 112 (1988) (establishing "miscarriage of justice" standard).

■ The doctrine of procedural default, in turn, prevents a federal habeas court from addressing a question of federal law decided by a state court "if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). We have previously explained that a state procedural rule is "adequate" only if the rule is "consistently or regularly applied." *Banks v. Horn*, 126 F.3d 206, 211 (3d Cir.1997) (quoting *Johnson*, 486 U.S. at 588–89, 108 S.Ct. 1981); *Doctor v. Walters*, 96 F.3d 675, 683 (3d Cir.1996). "[T]hese conditions must have existed at the time of the state court procedural default." *Cabrera v. Barbo*, 175 F.3d 307, 313 (3d Cir.1999).

■ In the instant case, the District Court rejected the Commonwealth's contention that the Pennsylvania Supreme Court's application of the miscarriage of justice standard to Jermyn's claims provided an adequate and independent ground for denying habeas relief. Relying on our previous decision in *Banks*, the District Court observed that "in death penalty

---

6. The Commonwealth actually made this procedural argument with respect to all of Jermyn's claims raised in his second PCRA petition that the District Court addressed on the merits. Obviously our analysis in the text that follows applies equally to those additional claims, even though our discussion only focuses on the penalty-phase ineffectiveness claim and the competency-related claims.

cases, the Pennsylvania Supreme Court does not strictly enforce the waiver rule . . . [and] it will often reach the merits of a claim regardless of whether a state procedural default would normally apply." *Jermyn v. Horn*, 1998 WL 754567, at *4. Thus, according to the District Court's reasoning, even if the Pennsylvania Supreme Court denied relief in the instant case based on its application of the miscarriage of justice standard, the state procedural rule that it applied is not "adequate," and therefore, it would not bar federal habeas review on the merits of Jermyn's claims.

We agree with the District Court's conclusion that our decision in *Banks* is controlling on this issue. There we engaged in a thorough review of Pennsylvania Supreme Court opinions to determine whether that court consistently or regularly declines to reach the merits of claims raised in second or subsequent PCRA petitions that may not meet the court's criteria that there be a " 'strong prima facie showing . . . that a miscarriage of justice may have occurred.' " *Banks*, 126 F.3d at 211 (quoting *Commonwealth v. Beasley*, 544 Pa. 554, 678 A.2d 773, 777 (1996)). We concluded that, as of the date of Banks' procedural default in 1995, the Pennsylvania Supreme Court had often reached the merits of issues raised in second PCRA

petitions in capital cases notwithstanding the failure of the petitioner to satisfy the "miscarriage of justice" standard. *Id.* Accordingly, we held that the relevant case law indicated that "the Pennsylvania Supreme Court does not apply the Pennsylvania procedural bar rules consistently in death penalty cases." *Id.* at 213.

In light of our holding in *Banks*, we conclude that the District Court properly found that the state court's application of the miscarriage of justice standard to Jermyn's claims did not provide an·adequate and independent state ground for denying relief on the merits. *Banks* analyzed the consistency and regularity of the Pennsylvania Supreme Court's application of state procedural bars up to the date of the petitioner's default in 1995, and found that the cases were inconsistent. Here, Jermyn's procedural default occurred in 1993, two years before Banks' default. Thus, our previous analysis of the Pennsylvania Supreme Court precedent is directly applicable here, and we must conclude, as we did in *Banks*, that the Pennsylvania Supreme Court has not consistently applied its procedural bar rules at the time that Jermyn procedurally defaulted his ineffectiveness claim. Accordingly, we reject the Commonwealth's procedural default argument, and we will proceed to the merits of Jermyn's claims.[7]

---

**7.** The Commonwealth raises two additional procedural challenges that relate to the claims on which Jermyn seeks relief that merit brief discussion. First, we reject the Commonwealth's assertion that we lack jurisdiction to consider the claims raised in Jermyn's appeal because the Court improvidently granted a CAPP as to those issues. The District Court's substantive analysis of Jermyn's claims provides ample support for its conclusion that Jermyn had made a "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2254(c)(2). The Court's exhaustive discussion of each of Jermyn's claims reflects the fact that Jermyn raised issues that were debatable on the merits and

"adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (internal citation marks omitted). Moreover, "in a capital case, the nature of the penalty is a proper consideration" in determining whether to grant a CAPP. *See Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983) (interpreting analogous pre-AEDPA standard for granting certificate of probable cause).

We also reject its assertion that the Court's order granting a CAPP did not comply with 28 U.S.C. § 2253(c)(3), which requires the Court to "indicate which specific issue or

## III.

### A. *Applicable Legal Principles*

#### 1. *Our Standard of Review under AEDPA*

■ In deciding this appeal, we must apply 28 U.S.C. § 2254(d)(1), which states in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States....

28 U.S.C. 2254(d)(1). The Supreme Court explained in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), that the two clauses, "contrary to" and "unreasonable application," have independent meaning.[8] *Id.* at 404, 120 S.Ct.

---

issues satisfy the showing required by" section 2253(c)(2). The order identified the claims on which it granted a CAPP by specific reference to the roman numerals Jermyn used in his habeas petition. While the Court's CAPP order did not provide a written description of the claims it deemed worthy of further review by this Court, obviously the District Court was intimately familiar with the legal issues raised in Jermyn's petition because it previously had scrutinized his fourteen claims. Given that the Court had just issued a lengthy opinion on the merits of the fourteen claims raised in Jermyn's petition, we find the method by which it chose to identify the issues for which a CAPP would be granted to be adequate in the circumstances. *See United States v. Eyer*, 113 F.3d 470, 473 (3d Cir.1997) (where district court failed to specify issues for which it granted a CAPP in accordance with 28 U.S.C. § 2253(c)(2), court of appeals entertained appeal on merits because, *inter alia*, the reason court issued a CAPP was obvious).

8. After the Supreme Court announced its decision in *Williams*, we asked the parties for supplemental briefing on the applicable standard. During argument, we also asked the parties to file letter briefs discussing whether the Pennsylvania Supreme Court's decision, which determined that Jermyn failed to meet Pennsylvania's "miscarriage of justice" standard with respect to the claims that he raised in his second PCRA petition, should be analyzed under § 2254(d)(1) which applies "to any claim that was *adjudicated on the merits* in a State court proceeding." *See* 28 U.S.C. § 2254(d)(1) (emphasis added); *see also Hameen v. Ferguson*, 212 F.3d 226, 248 (3d Cir. 2000) (explaining that the standards established by § 2254(d)(1) do not apply to issues not passed on in the state court proceedings); *Fisher v. Texas*, 169 F.3d 295, 299–300 (5th Cir.1999) (finding that state court's rejection of claim on procedural grounds did not constitute adjudication on merits, and therefore, AEDPA's deferential standard of review did not apply).

We conclude that, with the exception of the competency-related ineffectiveness claim, *see infra*, the Pennsylvania Supreme Court's decision on Jermyn's second PCRA petition did adjudicate the relevant issues we address on the merits such that we should review the state court's decision through the lens of § 2254(d). *E.g., Commonwealth v. Jermyn*, 709 A.2d at 859 (finding, after reviewing the evidence presented at trial and the PCRA proceeding, that the PCRA court correctly determined that no miscarriage of justice occurred as a result of counsel's failure to offer evidence uncovered at PCRA hearing concerning Jermyn's childhood during penalty phase); *id.* (finding that no miscarriage of justice occurred because of counsel's failure to offer childhood evidence during guilt phase in support of insanity defense); *id.* at 862 (noting that Jermyn "points to nothing which occurred during trial ... to establish that he was incompetent to stand trial and that the trial court should have held a hearing on that issue," and agreeing with PCRA court's conclusion that no miscarriage of justice occurred as a result of trial court's failure to order hearing *sua sponte*). While the "miscarriage of justice" standard applied by Pennsylvania courts is a procedural rule in that it plays a gatekeeping role in connection with second or subsequent petitions, its application invariably entails a merits analysis, given that

1495; *Hameen v. Ferguson*, 212 F.3d 226, 234–35 (3d Cir.2000).

As we explained in *Hameen*, the Supreme Court held in *Williams* that "under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."[9] *Hameen*, 212 F.3d at 235. We conclude that the Supreme Court

has not addressed a case involving a "set of materially indistinguishable facts" on the issues we address here, and it did not reach a conclusion that is opposite to that reached by the Supreme Court on a question of law.

Therefore, we will review Jermyn's claims through the lens of the "unreasonable application" prong of § 2254(d)(1).[10] In *Williams*, the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies

---

it "is met if the petitioner can demonstrate either: (a) that the proceedings resulting in his conviction were so unfair that a miscarriage of justice occurred which no civilized society can tolerate, or (b) that he is innocent of the crimes charged." *Szuchon*, 633 A.2d at 1099–1100. For purposes of determining the appropriate standard of review we must apply under AEDPA, we simply cannot ignore the circumstance that the correct application of the procedural rule at play here requires the court to review the underlying merits of a particular federal constitutional claim. *Cf. Hull v. Kyler*, 190 F.3d 88, 101 n. 4 (3d Cir.1999) (observing that Pennsylvania courts have frequently considered the merits of claims raised in second PCRA petitions in the context of determining whether petitioner met miscarriage of justice standard) (relying in part on Pennsylvania Supreme Court's analysis of the merits in *Commonwealth v. Jermyn*, 709 A.2d at 860–62). Therefore, we conclude that where, in the course of its analysis, the Pennsylvania Supreme Court actually considered whether the claims raised in Jermyn's second PCRA petition met the procedural "miscarriage of justice" standard, we are presented with the type of situation in which Congress intended us to review the state court's resolution of those issues with the appropriate level of deference due under AEDPA's § 2254(d).

9. The opinion of the Court on the statutory interpretation issue, written by Justice O'Connor, is found at Part II of her concurring opinion. *Williams*, 529 U.S. at 402–13, 120 S.Ct. 1495 (O'Connor, J., concurring). However, the opinion of the Court addressing the application of § 2254(d)(1) to the state court decision at issue, written by Justice Stevens,

is found at Part IV of his opinion. *Id.* at 391, 120 S.Ct. 1495.

10. While our analysis will proceed under § 2254(d)(1)'s "unreasonable application" prong, we pause to note two points. First, we realize, of course, that the District Court granted habeas relief on the penalty-phase ineffectiveness claim under 28 U.S.C. § 2254(d)(2) rather than § 2254(d)(1). Section 2254(d)(2) provides that habeas relief is appropriate if the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* The parties agree that the District Court's reliance on § 2254(d)(2) was erroneous because the District Court did not find that the state supreme court erred in determining a matter of historical or primary fact. Rather, the District Court determined that the state court erred in analyzing Jermyn's ineffectiveness claim in light of the trial record and the PCRA proceedings—in other words, it determined that the state court unreasonably applied *Strickland*'s prejudice analysis to the facts of Jermyn's case. As we explain in greater detail later in this opinion, we agree that the state court's error in that regard is more appropriately considered by reference to § 2254(d)(1).

Second, with respect to the competency-related ineffectiveness claim, for the reasons that we explain later, we have concluded that AEDPA's deferential standards of review do not apply. Therefore, we apply *de novo* review the merits of that claim, and will address it "without special heed to the underlying state court decision." *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir.2001).

the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 407, 120 S.Ct. 1495. In determining whether the state court unreasonably applied Supreme Court precedent, the federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 410, 120 S.Ct. 1495. "[U]nder the 'unreasonable application' clause, 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Hameen*, 212 F.3d at 235 (quoting *Williams*, 529 U.S. at 411, 120 S.Ct. 1495).

### 2. Ineffective Assistance of Counsel

In this case, the District Court granted relief on Jermyn's claim that he was denied his constitutionally guaranteed right to the effective assistance of counsel when counsel failed to investigate and present mitigating evidence to the jury during the sentencing proceedings. Jermyn also claims that he was denied effective assistance of counsel with respect to counsel's presentation of the insanity defense and counsel's failure to request a competency hearing or evaluation from the trial court. Our analysis of Jermyn's ineffectiveness claims are governed by the Supreme Court's clearly established precedent of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

To successfully present a claim for ineffective assistance of counsel under *Strickland*, Jermyn must establish first that counsel's performance was deficient. "This requires showing that counsel made errors so serious that counsel was not

functioning as the 'counsel' guaranteed defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. 2052. The petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness" meaning "reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052. In assessing counsel's performance, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. 2052. There is a "strong presumption" that counsel's performance was reasonable. "That is to say, the 'defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Berryman v. Morton*, 100 F.3d 1089, 1094 (3d Cir.1996) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052).

■ Second, the petitioner must demonstrate that he was prejudiced by counsel's errors. *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052. The petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* This standard "is not a stringent one;" it is less demanding than the preponderance standard. *Baker v. Barbo*, 177 F.3d 149, 154 (3d Cir.1999).

■ *Strickland* explains that "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. Similarly, "when a defendant challenges a death sentence, ... the question is wheth-

er there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent that it independently weighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* Moreover, in assessing prejudice in the context of a determination regarding a defendant's competency, the question is whether there was a reasonable probability that he would have been found incompetent to stand trial. *Hull v. Kyler*, 190 F.3d 88, 106 (3d Cir. 1999). In determining whether the result of the proceeding might have been different, we must consider "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052; *see also Williams*, 529 U.S. at 397–98, 120 S.Ct. 1495 (concluding that the state supreme court unreasonably applied *Strickland* because it "failed to evaluate the totality of the mitigating evidence—both that adduced at trial, and the evidence adduced at the habeas proceeding—in reweighing it against the evidence in aggravation").

### 3. *Competence to Stand Trial*

 A defendant has a due process right not to be tried while incompetent. *Drope v. Missouri*, 420 U.S. 162, 171–72, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 385, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). To be competent to stand trial, a defendant must have "a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and must possess "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam). Due Process requires the trial court to inquire *sua sponte* as to the defendant's competence in every case in which there is a reason to doubt the defendant's compe-

tence to stand trial. *Drope*, 420 U.S. at 173, 95 S.Ct. 896 (finding that Illinois statute, which required a court to grant competency hearing *sua sponte* if there was "reasonable cause to believe" that the defendant was incompetent, comported with due process, and that trial court's failure to hold hearing despite indicia of incompetence violated defendant's right to fair trial); *Pate*, 383 U.S. at 385, 86 S.Ct. 836 (stating that failure to hold competency hearing violated due process where state statute required trial court to order hearing where there was "reason to doubt" defendant's competency, and the evidence was sufficient to put the trial court on notice of potential problem); *United States v. Haywood*, 155 F.3d 674, 680 (3d Cir. 1998) (finding that federal competency statute, 18 U.S.C. § 4241, "requires a record-based judicial determination of competence in every case in which there is reason to doubt the defendant's competence to stand trial," and noting that "the Due Process Clause ... requires no less"); *United States v. DiGilio*, 538 F.2d 972, 987 (3d Cir.1976) ("Although § 4244 does not say so explicitly, due process requires that the trial court inquire *sua sponte* into the defendant's competence if there is reason to doubt it."). Moreover, counsel's failure to request the trial court to order a hearing or evaluation on the issue of the defendant's competency, *see* Pa. Stat. Ann. tit. 50, § 7402(c), (d), could violate the defendant's right to effective assistance of counsel provided there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency, and there is a reasonable probability that the defendant would have been found incompetent to stand trial had the issue been raised and fully considered. *E.g., Hull*, 190 F.3d at 106 (noting that defendant could establish the prejudice prong of an ineffectiveness claim if there were sufficient indicia of incom-

petence and counsel failed to request a competency hearing).

## B. *Jermyn's Guilt Phase Claims*

As we have explained, Jermyn's appeal relates to the District Court's disposition of several of his guilt-phase claims, while the Commonwealth's appeal challenges the District Court's grant of penalty phase relief. After reviewing each of the guilt-phase claims and the District Court's disposition of them, we conclude that the record supports the District Court's conclusion that Jermyn is not entitled to a new trial on the issue of his guilt.[11] Given their complexity, we will address three guilt-phase claims that we believe merit discussion: (1) the claim that counsel was ineffective in failing to adequately investigate, develop and present the insanity defense at the guilt phase of the trial; (2) the claim that Jermyn's due process rights were violated because he was tried while incompetent as a result of the trial court's failure to order a competency hearing on its own motion; and (3) the claim that Jermyn was denied effective assistance of counsel based on Lysaght's failure to raise the issue of Jermyn's competency by requesting competency hearing or court-ordered evaluation under Pennsylvania law prior to, or during, trial.

### 1. *Counsel's Ineffectiveness in Presenting the Insanity Defense*

First, Jermyn argues that counsel was ineffective in investigating and presenting Jermyn's insanity defense. Jermyn points out that counsel failed to present evidence of Jermyn's childhood abuse and how it related to his adult life and his sanity at the time of the offense. He claims specifically that counsel should have investigated the matter further, contacted Sharon Isralow, and obtained the Scotland School records to obtain background information prior to trial. He claims that the evidence of Jermyn's childhood abuse and the fact that his mother did not protect him from the abuse was critical in understanding the root of Jermyn's mental illness and how his illness supported his defense of insanity. Jermyn's Initial Br. at 92.

He also claims that counsel was ineffective in the manner in which he utilized the V.A. records during Dr. Phillips' direct examination. Jermyn contends that counsel should have asked Dr. Phillips more specific questions regarding many entries that showed that Jermyn's mental illness was such that he lacked contact with reality throughout his life. *Id.* at 114. Finally, he claims that counsel was ineffective in failing to correct the prosecutor's mischaracterization of information in a mental health text that referred to schizophrenia as a "myth." Jermyn points out that "effective counsel would have used the same text ... to rehabilitate Dr. Phillips and to cure the extreme prejudice created by the prosecutor's mischaracterization." *Id.* at 117.

The Pennsylvania Supreme Court rejected this claim, finding, *inter alia*, that

---

**11.** In addition to those we discuss in the text, Jermyn asserts on appeal that he is entitled to a new trial on the grounds that: (1) he was denied due process because the Cumberland County District Attorney's office labored under an impermissible conflict of interest, as the District Attorney was the executor of Jermyn's mother's estate, and (2) the trial court violated Jermyn's Sixth Amendment right to self-representation in refusing to grant his mid-trial request to represent himself. As we previously mentioned, we have reviewed the record and the legal basis for the state court's determinations pursuant to the applicable standard of review, 28 U.S.C. § 2254(d)(1),(2), but we ultimately find that these additional issues are without merit. Thus, we will affirm the Court's ruling on these claims essentially for the reasons set forth in the District Court's opinion.

Jermyn could not establish prejudice, *i.e.*, that there was a "reasonable probability that, but for his trial counsel's alleged failure to more fully present evidence on his defense of insanity ... the outcome of his trial would have been different." *Commonwealth v. Jermyn*, 709 A.2d at 859. The court reasoned that "the record shows that trial counsel placed the issue of Jermyn's insanity before the jury and presented evidence to support that defense." *Id.* It noted that the additional evidence concerning Jermyn's childhood and his mental illness would have been "cumulative" of the other evidence presented on the insanity defense. *Id.*

The District Court agreed with the Pennsylvania Supreme Court that "trial counsel effectively placed in evidence the question of Jermyn's sanity." *Jermyn v. Horn*, 1998 WL 754567, at *18. While it disagreed with the Pennsylvania Supreme Court's characterization of the childhood evidence as cumulative of the other evidence of abuse that had been presented, the Court nevertheless noted that the omitted evidence was not so integral to the insanity defense that it would have probably changed the jury's mind on the issue of Jermyn's criminal responsibility for the murder. The Court opined "that the thrust of the new testimony [concerning the childhood abuse] would have been to explain why Jermyn murdered his mother, but providing a motive for the crime would not have added anything to the insanity defense." *Id.* Based on these observations, the Court found, at least implicitly, that the Pennsylvania Supreme Court's decision was not an "unreasonable application" of *Strickland* based on the facts of this case, and it denied relief under 28 U.S.C. § 2254(d)(1). We agree with the District Court's analysis on this point.

■ The Pennsylvania Supreme Court's conclusion that Jermyn could not establish that he had been prejudiced by his counsel's actions is not objectively unreasonable, given the wealth of evidence counsel actually presented concerning the nature of Jermyn's mental illness, its manifestations, and his probable insanity at the time of the murder. In assessing prejudice to Jermyn's insanity defense, we must consider "the totality of the evidence" before the jury on the issue of Jermyn's insanity at the time of the crime. *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. Here, as both the Pennsylvania Supreme Court and the District Court observed, counsel did place the issue of Jermyn's sanity before the jury and presented evidence that supported that defense. He presented the testimony of Dr. Phillips, who explained in detail the nature of chronic paranoid schizophrenia, its symptoms and manifestations, and why he believed that Jermyn suffered from the disease for many years leading up to the murder. The jury also heard Dr. Phillips testify that Jermyn's chronic paranoid schizophrenia could have rendered him "seriously" unable to "tell ... what is right and what is wrong." Trial Tr. V.2, at 767a. Dr. Phillips explained that the symptoms of Jermyn's illness, including his delusions of superiority, could have led him to believe that he had "morality at times which is above society." *Id.* Consistent with this testimony, Dr. Phillips also told the jury that Jermyn believed he was a "fidget of god," and that he had some special relationship with God that evidently, in his mind, meant that he was equal to God and thus above the law. *Id.* at 728a.

Dr. Phillips also informed the jury that his diagnosis was consistent with that of several other mental health professionals from the V.A. that had determined, over an eight to ten-year period, that Jermyn suffered from paranoid schizophrenia. He further explained that Jermyn had been

awarded total disability benefits, and that it was difficult to obtain such benefits unless there was a legitimate mental health problem at issue.

Moreover, while we recognize that counsel could have gone into more detail about specific entries in the V.A. records that supported Dr. Phillips' diagnosis, we do not ascribe much significance to the fact that he failed to do so. We do not believe that providing the jury with specific details in the V.A. records would have added much to the insanity defense, in view of the fact that Dr. Phillips informed the jury, both on direct and redirect, that Jermyn had been consistently diagnosed by V.A. mental health professionals as suffering from a serious mental illness that required treatment.

We also are not troubled by the fact that counsel failed to rehabilitate Dr. Phillips' concession that a leading psychiatric text documented the fact that some mental health professionals considered schizophrenia to be a "myth." While it is true that counsel could have easily rebutted that assertion by reading the entire passage from the text, Dr. Phillips' own testimony provided a retort to the Commonwealth's suggestion. Indeed, after Dr. Phillips acknowledged that some persons believe that schizophrenia is a myth, he quickly reaffirmed his diagnosis and pointed to the fact that it was consistent with that of other mental health professionals that had seen Jermyn in the past. And on redirect, counsel again pointed out to the jury that at least "eight to ten" mental health professionals agreed with Dr. Phillips that Jermyn suffered from a psychosis rather than merely a personality disorder.

We recognize, of course, that counsel did not present the evidence that was developed at the PCRA hearing concerning Jermyn's childhood experiences and the role that Jermyn's mother played in the household, and that the meager evidence that was presented on that issue, through Reverend Falk, was of a totally different quality. We further realize that the childhood abuse evidence could have helped to prove Jermyn's mental illness because it explained its origin, and we appreciate that proving his mental illness, in turn, was a necessary precondition to establishing Jermyn's insanity. Indeed, the evidence would have bolstered Dr. Phillips' conclusion that Jermyn suffered from chronic paranoid schizophrenia, and in that sense, the evidence would have supported Dr. Phillips' opinion that the symptoms of his mental illness could have caused him to be unable to appreciate the criminality of his conduct. However, even assuming that counsel was ineffective in failing to investigate and present that evidence during the guilt-phase of the trial, we do not believe that the omitted evidence was so significant that, if it had been presented, the jury would have found Jermyn insane at the time of the murder. In this regard, we agree with the District Court that the evidence of the childhood abuse and his mother's involvement in it would have shown the roots for his mental illness and would have explained his motivation for murdering her, but this evidence does not directly speak to the issue of whether Jermyn was insane at the very moment that he killed his mother. Rather, it merely corroborates the other evidence presented on the related, but legally distinct, issue of whether Jermyn suffered from chronic paranoid schizophrenia. As we have explained, there was plenty of evidence from which the jury could have concluded that Jermyn was mentally ill, and the childhood evidence was most significant to that issue. Thus, while we view the childhood evidence as more than just "cumulative," we do not think that it was critical to the insanity defense.

Accordingly, we do not believe that the omission of the childhood evidence prejudiced Jermyn's insanity defense in the *Strickland* sense. Put differently, given the nature of the evidence omitted and the manner in which the insanity defense was actually presented, we do not believe that there is a reasonable probability that the jury would have found Jermyn insane had counsel performed in the manner that Jermyn now suggests he should have. *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052.

### 2. Trial Court's Failure to Order Competency Evaluation or Hearing

■ Jermyn next claims that the trial court violated Jermyn's right to a fair trial by not ordering a competency hearing or evaluation pursuant to Pennsylvania law. He also maintains that, as a result of the trial court's omission, he was tried while incompetent. Jermyn asserts that there were sufficient signals to call his competence into question such that the trial court should have had "reason to doubt" whether Jermyn possessed the "present ability to consult with his lawyer with a reasonable degree of rational understanding" and had "a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402, 80 S.Ct. 788. According to Jermyn, the trial court was aware of the following indicia of incompetency that should have given the court reason to doubt his competence to stand trial: (1) Jermyn had refused to take his diabetes medication and the court had to order involuntary medical treatment for him three times during his pretrial incarceration; (2) Jermyn pursued an insanity defense and several mental health professionals diagnosed him as suffering from chronic paranoid schizophrenia; (3) Jermyn's poetry, introduced during the trial, was filled with strange, delusional statements; (4) Jermyn had a long history of

mental illness and had attempted suicide several years before the murder, as documented in the V.A. records; and (5) Jermyn made strange statements when he was interrogated, *i.e.*, "Well if you feel froggy go ahead and arrest me," and his testimony and poetry presented during the trial was bizarre.

Jermyn also relies on the fact that during trial, the trial court denied Jermyn's request to represent himself, stating:

> Let the record show he has placed in evidence a sanity defense, that he is insane, that under the circumstances, at this late stage of the trial, I feel as a matter of law to go into a long range colloquy with him to determine whether or not he could competently represent himself, *on the facts as I know them and on the evidence in the record, he cannot competently defend himself.* I make that finding of fact. The motion is denied.

Trial Tr. V.2, at 774a (emphasis added). He claims that this statement is the equivalent of a finding that Jermyn was incompetent to stand trial, because the standard for competency to represent oneself and competency to stand trial is the same. He thus maintains that the trial court's failure to halt the proceedings and declare a mistrial, once the court found him incompetent, denied him due process of law because he was tried while incompetent.

The Pennsylvania Supreme Court addressed and rejected Jermyn's due process claim based on the trial court's failure to order a competency evaluation on its own motion, stating that "Jermyn points to nothing which occurred during trial, aside from the judge's ruling on his request to remove his counsel, to establish that he was incompetent to stand trial and that the trial court should have held a hearing on this issue." *Commonwealth v. Jermyn*,

709 A.2d at 862. The Court also rejected Jermyn's characterization of the trial court's statement regarding Jermyn's competency to defend himself as a finding that he was legally incompetent to stand trial. It stated that the thrust of the trial court's finding was that Jermyn did not have the legal acumen to present an adequate defense, and that, at the stage of the trial in which it arose, it was not prudent to allow Jermyn to attempt to defend himself. It opined that "[t]o characterize [the trial court's] brief statement as a ruling on Jermyn's competence to be tried is to focus on one word, 'competent,' rather than the context in which it was spoken."[12] *Id.*

The District Court found that the Pennsylvania Supreme Court's decision was not an unreasonable application of the principles announced in *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), and *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). It also concluded that the Pennsylvania Supreme Court's reading of the trial court's statement that Jermyn "cannot competently defend himself," was "a reasonable reading of the record" and was not an unreasonable factual finding under § 2254(d)(2). *Jermyn v. Horn*, 1998 WL 754567, at *22. With respect to the information known to the trial court relevant to the issue of Jermyn's competence, the Court opined:

> [W]e believe they are not sufficient to have instilled doubt in the trial court as to Jermyn's competency. First, unfortunately, there was nothing "bizarre" about the crime. The petitioner first beat his mother and then set fire to her room. This is bizarre only in the sense that most people do not commit violent acts. Second, Jermyn's extensive psychiatric records, while indicative of mental illness, did not indicate incompetence to stand trial. *See Drope*, [420 U.S. at 162, 95 S.Ct. 896]. Third, Jermyn did not exhibit the type of bizarre behavior during trial that should have raised doubt. The suicide attempts were in the past. And Jermyn's statement to police officers (Jermyn said they could arrest him if they felt "froggy") and his poems could have been reflections of his mental illness that had no bearing on his competency to stand trial. *Compare Drope*, *supra* (defendant's attack on his wife the Sunday before his trial for assisting in her rape and his self-inflicted gunshot wound during trial were bizarre behaviors that should have triggered a *sua sponte* competency inquiry by the trial judge). Fourth, the trial judge did hear some evidence that Jermyn had refused, and was refusing, to take antipsychotic medication, but the context in which this came up would not have alerted him to potential competency issues. (Doc. 24 at pps. 759a, 762a). It arose in the context of cross-examination of petitioner's psychiatric expert in which the prosecutor elicited the admission that V.A. doctors had found Jermyn competent, at least in some respects, at the same time he was refusing medication. Refusal in these circumstances would not have triggered any concern in the trial judge.
>
> Finally, the petitioner relies on the defense of insanity. However, it is important to note that competence to stand

---

12. Chief Justice Flaherty dissented. Contrary to the majority's characterization of the trial court's comment that Jermyn "cannot competently defend himself," the dissent concluded that the court had made a factual finding that Jermyn was incompetent in the legal sense of the word. *Commonwealth v. Jermyn*, 709 A.2d at 870–71 (Flaherty, J., dissenting). The dissent opined that Jermyn's counsel had been ineffective for failing to request a mistrial once the trial court declared him to be incompetent, because at that point, "Jermyn was entitled to a termination of the trial due to his incompetence...." *Id.* at 871.

trial raises different issues from an insanity defense, *see Drope, supra,* 420 U.S. at 175–76, 95 S.Ct. 896, ... so that the mere fact that an insanity defense is presented does not mean the defendant is incompetent to stand trial. Further, trial counsel, while putting on this insanity defense, did not himself raise the issue of his client's competence to stand trial.

Moreover, Jermyn does not assert that his demeanor at trial should have triggered concern. A sane demeanor may alone obviate the need for the court to inquire into a defendant's competence. *Drope, supra,* 420 U.S. at 179, 95 S.Ct. 896.... And the court need not inquire if no other circumstances signal a need for a competency examination. *Id.* at *22–23.

▇ We agree with the District Court's disposition of this claim. As an initial matter, the District Court correctly determined that the trial court's finding that Jermyn could not "competently represent himself" "at[that] late stage of the trial" was not tantamount to a conclusion that Jermyn was legally incompetent to stand trial. Rather, we agree with the District Court's determination that it was not unreasonable for the Pennsylvania Supreme Court to interpret that statement to mean that, based on the point at which self-representation was sought (mid-trial), Jermyn could not represent himself adequately.

Jermyn contends nevertheless that the trial court's statement must be interpreted as indicating that the court believed that Jermyn was incompetent to stand trial. According to the logic of his argument, if the trial court found him to be legally incompetent to represent himself, he was also legally incompetent to stand trial because the competency standard for standing trial is the same as for waiving counsel.

Jermyn's Initial Br. at 158 (citing *Godinez v. Moran,* 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993)). He further asserts that the trial court's ruling was one of competency because a court is not permitted to base its ruling on whether a defendant has the legal skills to defend himself, as that is not the appropriate inquiry under *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Rather, when the accused seeks self-representation, the issue is whether a defendant "knowingly, intelligently and voluntarily waived the right to be represented by counsel." *Buhl v. Cooksey,* 233 F.3d 783, 791 (3d Cir.2000). Thus, Jermyn's argument is that we cannot view the statement as an observation concerning Jermyn's lack of legal acumen, because to do so would mean that the trial court improperly denied him the right of self-representation under *Faretta.*

We are not convinced by either argument. In *Godinez,* the Court held that the *competency* standard for waiving counsel and for standing trial is the same, but it further found that, in order to waive the right to counsel, the waiver also must be knowing and voluntary. 509 U.S. at 400, 113 S.Ct. 2680. The fact is that the competency standard is only part of the inquiry, and we think the court was making a much broader statement. Bearing in mind that Jermyn's request was made mid-trial, when the Court knew all too well Jermyn's strange theory of the case and the direction that he, acting on his own, would take it, we view the court's statement in context as its own reasonable conclusion that Jermyn should not be permitted to follow this course; it was not a narrow declaration that Jermyn lacked the mental ability to waive counsel and choose self representation. *See Godinez,* 509 U.S. at 401 n. 12, 113 S.Ct. 2680 ("The focus of a competency inquiry is the defendant's

mental capacity; the question is whether he has the *ability* to understand the proceedings").

We further conclude that our understanding the trial court's statement as such does not mean that the trial court's ruling violated Jermyn's right of self-representation and the teachings of *Faretta*. To be sure, the Court in *Faretta* stated that "the defendant's technical legal knowledge [is] not relevant to an assessment of his knowing exercise of the right to defend himself." 422 U.S. at 836, 95 S.Ct. 2525. Instead, the test is whether the defendant "knowingly, intelligently and voluntarily waived the right to be represented by counsel." *Buhl*, 233 F.3d at 791. Here, the trial court's statement does not violate the dictates of *Faretta* because we understand it as conveying that the court would not allow Jermyn to disrupt the trial and pursue his own defense, based on the trial court's understanding that there was more at stake, both strategically and actually, than Jermyn could possibly appreciate. In other words, we read the court's statement as more of an assessment of whether Jermyn's attempted waiver of counsel was "knowing" rather than a denial of self-representation based on Jermyn's lack of legal skills. Moreover, the trial court's finding in this regard does not violate Jermyn's right to self-representation, as it clearly was motivated primarily by its belief that allowing Jermyn to act as his own counsel *at that point* would have improperly disrupted the proceedings, and the mention of Jermyn's ability to represent himself should be read in that context. *Jermyn v. Horn*, 1998 WL 754567, at *22, *24. The trial court was well within its discretion in denying Jermyn's request, and did not violate *Faretta* in doing so. *E.g., Buhl*, 233 F.3d at 797 n. 16 ("After trial has commenced, the right of self-representation is curtailed, and the judge considering the motion must weigh the prejudice to ... the defendant against the potential disruption of the proceedings ...."); *accord Martinez v. Court of Appeal of Cal., Fourth Appellate District*, 528 U.S. 152, 161–62, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000) (noting that the right to self-representation "is not absolute" under *Faretta*, and "most courts require [the defendant] to [invoke the right] in a timely manner"). Thus, we cannot accept Jermyn's characterization of the trial court's statements as a pronouncement of Jermyn's incompetence to stand trial, and we do not find that the court's observations, as such, violated Jermyn's right to self-representation.

Inasmuch as Jermyn relied upon the trial court's supposed finding of legal incompetency as proof that Jermyn's due process rights were violated because he was tried while incompetent, we may easily reject that aspect of his due process claim. He simply has not presented sufficient evidence that he was actually incompetent to stand trial in August 1985 to warrant relief under § 2254(d). Thus, we will affirm the District Court's ruling on this point.

We further agree with the District Court's conclusion that Jermyn is not entitled to relief under § 2254(d)(1) because the Pennsylvania Supreme Court's decision does not result in an "unreasonable application" of the Supreme Court's decisions in *Drope* and *Robinson*.[13] In *Robin-*

13. At oral argument, Jermyn contended that this issue should be analyzed under the "contrary to" prong of § 2254(d)(1) because the Supreme Court's decision in *Robinson* is materially indistinguishable from the instant case. As will become evident from the discussion that follows in the text, we disagree with counsel's characterization of *Robinson* as materially indistinguishable, and thus,

*son*, the Supreme Court concluded that the trial court violated the defendant's right to a fair trial in failing to order a competency hearing on its own motion, as permitted under state law. *Robinson*, 383 U.S. at 385, 86 S.Ct. 836. The defendant had killed his common law wife, but he claimed that he was not responsible for the murder because he was insane at the time of the crime. The Supreme Court noted that throughout the proceedings, defense counsel "insisted that Robinson's present sanity [*i.e.*, competence] was very much in issue." *Id.* at 384, 86 S.Ct. 836. Notwithstanding defense counsel's statements that clearly placed the defendant's competency in question and the state's concession that it did not object to further inquiry on the issue, the trial court did not conduct its own inquiry to determine whether the defendant was competent to stand trial. Rather, the trial court relied on a stipulation from the state's expert stating that, at the time of the examination (approximately two to three months before trial), the defendant knew the nature of the charges against him and was able to cooperate with counsel.

Ultimately, the defendant was found guilty, but the Supreme Court reversed the conviction. It held that the circumstances of the case, including the fact that there was uncontradicted testimony recounting "a long history disturbed behavior," raised a "bona fide" doubt as to the defendant's competence to stand trial that required the trial court to conduct a competency hearing. *Id.* at 385, 86 S.Ct. 836. The Court noted the fact that, even though defense counsel expressly placed the question of defendant's competency in issue, and the state did not object to further inquiry on the subject, the trial court chose not to conduct its own inquiry. It also pointed to testimony indicating that the

defendant had been hospitalized for his mental illness, was violent, often stared and appeared "in a daze," "paced the floor saying something was after him," and shot and killed his 18 month-old son and twice attempted suicide several years before he killed his wife. *Id.* at 379–80, 86 S.Ct. 836. Under the circumstances, the Court determined that the trial court's failure to intervene and order a competency hearing on its own motion violated the defendant's right to due process.

Subsequently, in *Drope*, the Court also held that the trial court violated the defendant's right to a fair trial in failing to order a psychiatric examination *sua sponte*, as permitted under state law, to determine if he was competent to stand trial. There the defendant was convicted of forcibly raping his wife with four other individuals. Prior to trial, defense counsel filed a motion seeking a continuance to allow the defendant to undergo further psychiatric examination and treatment, and attached a psychiatric report that contained observations by the examiner that were relevant to the issue of the defendant's ability to assist in his own defense, but the report did not include any explicit findings regarding the defendant's competency. *Drope*, 420 U.S. at 177, 95 S.Ct. 896. Notwithstanding the report, the trial court denied the motion, and did not make any inquiry on its own as to the defendant's competence to stand trial. At trial, the defendant's wife testified that, while she originally decided not to prosecute the case against her husband because she believed he was mentally ill, she changed her mind because her husband tried to kill her just prior to trial. *Id.* at 166, 95 S.Ct. 896. Later during trial, the defendant attempted suicide by shooting himself. *Id.*

there is no need to address the "contrary to" aspect of § 2254(d)(1) any further.

The Supreme Court reversed the defendant's conviction, finding that there were sufficient indicia of incompetence to require the court to make further inquiry into the defendant's competence to stand trial and order an evaluation. Initially, the Court noted that defense counsel's motion for continuance was sufficient to raise the issue of incompetency before the trial court. *Id.* at 177, 95 S.Ct. 896. The Court also pointed to notations in the psychiatric report attached to the motion that indicated that the defendant might have difficulty assisting in his defense. *Id.* at 175–76, 95 S.Ct. 896. It also relied on the wife's testimony at trial concerning her husband's history of strange behavior and his attempt to kill her prior to trial, noting "[f]or a man whose fate depended in large measure on the indulgence of his wife, who had hesitated about pressing the prosecution, this hardly could be regarded as rational conduct." *Id.* at 179, 95 S.Ct. 896. Finally, the Court cited the defendant's mid-trial suicide attempt as indicative of his incompetence to stand trial, as it "suggest[ed] a rather substantial degree of mental instability contemporaneous with the trial." *Id.* at 181, 95 S.Ct. 896.

Having examined Jermyn's situation against the teachings of *Drope* and *Robinson*, we conclude that the result reached by the Pennsylvania Supreme Court is not an "unreasonable application of" Supreme Court precedent because the information that Jermyn claims was sufficiently suggestive of his incompetence was not of the same character, and simply was not strong enough to have given the trial court reason to doubt whether Jermyn was competent to stand trial such that the court should have exercised its authority conferred to it under Pennsylvania law and ordered an examination or hearing on its own motion.[14] Moreover, and perhaps more importantly, unlike *Drope* and *Robinson*, counsel did not give any indication to the trial court that he doubted Jermyn's competence to stand trial. In fact, quite the opposite was true; the facts as they developed before the trial court were not such that the court would have inferred that there was any reason, from counsel's point of view, to doubt the defendant's competence.

■ In determining whether there were sufficient indicia of incompetence to warrant the trial court to order a competency evaluation or hearing on its own motion, we must consider the nature and quality of the facts known to the court, and we must consider their probative force in the aggregate, although any one factor may be sufficient depending on the circumstances. *Drope*, 420 U.S. at 180, 95 S.Ct. 896. The Court in *Drope* stated that evidence of a defendant's history of irrational behavior, his demeanor at trial and any prior medical opinion on competence are factors that should be considered, among others. *Id.* And, depending on the circumstances, even one factor may be sufficient, standing alone, to require further inquiry. *Id.*

Here, we acknowledge that there are some facts that the trial court knew that could be viewed as casting doubt on Jermyn's competence. To be sure, the Court knew that Jermyn had refused to take his diabetes medication while in pre-trial custody, had a history of mental illness and odd behavior, claimed he was insane at the

---

**14.** Under Pennsylvania law, the court "may order an incompetency examination" on its own motion at any stage of the proceedings and may do so without a hearing unless the examination is objected to by the accused. If the accused objects, the court may order an examination if it concludes, after a hearing, that there is a "prima facie question of incompetency." Pa. Stat. Ann., tit. 50, § 7401(d).

time of the offense, and exhibited strange behavior both when he was arrested and later during the trial. Moreover, Dr. Phillips testified that Jermyn had attempted suicide in the past, and the attempt was documented in the V.A. records that were presented during the guilt and penalty phases of the trial. However, when compared to the factors involved in *Drope* and *Robinson*, these circumstances are not sufficiently indicative of incompetence to have instilled doubt in the trial court as to Jermyn's competency, especially given defense counsel's failure to give any indication to the court that he was concerned about that issue.

First, we note that, unlike *Drope*, Jermyn's suicide attempt was not contemporaneous with the trial proceedings; rather Jermyn attempted suicide several years prior to the murder. Thus, the suicide attempt documented in the V.A. records did not necessarily suggest a high degree of mental instability at the critical point— around the time of the trial. *E.g., Drope*, 420 U.S. at 178–80, 95 S.Ct. 896 (holding that trial court should have ordered competency evaluation where, *inter alia*, defendant shot himself during trial; Court noted that mid-trial suicide attempt "suggests a rather substantial degree of mental instability contemporaneous with the trial"); *United States v. Loyola–Dominguez*, 125 F.3d 1315, 1319 (9th Cir.1997) (stating that defendant's suicide attempt on the eve before trial began should have given court "reason to doubt" defendant's competency, especially in view of equivocal answers defendant gave to the court when it asked whether he understood what was happening); *Tiller v. Esposito*, 911 F.2d 575, 578 (11th Cir.1990) (finding that trial court should have inquired into defendant's com-

petence where he exhibited irrational behavior, "particularly[two] suicide attempts," while in pretrial incarceration).

Moreover, Jermyn's insanity plea, his psychiatric history, and his history of strange behavior, are all consistent with Jermyn's claim that he was severely mentally ill. However, those facts do not necessarily suggest that, because of his mental illness, Jermyn was incapable of understanding the proceedings and assisting in his defense. *See Godinez v. Moran*, 509 U.S. 389, 401 n. 12, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (stating that the focus of a competency inquiry is the defendant's mental capacity, *i.e.*, whether he has the *ability* to understand the proceedings). Gloria Seilor testified that Jermyn was "odd," wrote "odd" poetry, and was not "normal." Dr. Phillips testified that Jermyn had delusional and grandiose thoughts for several years, that the V.A. records corroborated his diagnosis of chronic paranoid schizophrenia, and that his mental illness could have rendered him incapable of appreciating the wrongfulness of his actions. However, Dr. Phillips did not offer any opinion on Jermyn's competence to stand trial. Moreover, Jermyn's past behavior, while admittedly unusual, was unlike the striking psychiatric history presented in *Robinson*, where the trial court heard uncontradicted testimony that the defendant, *inter alia*, often "appear[ed] in a daze," believed that persons were trying to harm him, and, most importantly, inexplicably killed his 18 month-old son and then attempted suicide by shooting himself in the head before he later killed his common law wife in an unrelated incident.[15] *Robinson*, 383 U.S. at 379–81, 86 S.Ct. 836.

**15.** We note that the V.A. records documented Jermyn's history of bizarre behavior. However, we do not believe that his past strange

behavior was significant enough to cause the trial court to doubt his competence. While the Court in *Robinson* found that the defen-

We have not overlooked the fact that Jermyn refused to take his diabetic medication and the trial court was forced to sign orders compelling him to submit to blood sugar tests. We also note that Jermyn's poetry, filled with delusional and disturbing statements, was indeed bizarre. However, Jermyn's actions during the trial proceedings certainly were not the equivalent of the strange behavior that the defendant exhibited in *Drope*, where he attempted to murder his wife the night before she testified at his rape trial, even after she had indicated her unwillingness to press charges against her husband because of his illness, and later attempted suicide mid-trial. *Drope*, 420 U.S. at 166, 95 S.Ct. 896. Here, Jermyn's pretrial behavior in failing to take his diabetic medication was counterproductive to his physical well-being, but it certainly was not counterproductive to his defense, as was the defendant's inexplicable behavior in *Drope*.

▮ Moreover, notwithstanding Jermyn's odd poetry and his statement that he did not believe the experience was "stressful," his overall demeanor before the trial court was not so bizarre or irrational that it should have alerted the court to the possibility that he was incompetent to stand trial. A defendant's demeanor before the trial court is one factor that we may consider in determining if the court should have had a bona fide doubt in a defendant's competence to stand trial, *Robinson*, 383 U.S. at 386, 86 S.Ct. 836, although a defendant's seemingly sane demeanor is not dispositive where there are other persuasive indicia of incompetence. *Drope*, 420 U.S. at 170, 95 S.Ct. 896. In this regard, we point out that Jermyn had

appeared before the trial court several times prior to the trial and seemed fully capable of understanding the proceedings, communicating with counsel and assisting in his defense.

For example, as we have noted, Jermyn's original trial counsel, Edward Guido, Esq., was removed from his case after the trial court determined that Jermyn had sufficient funds to pay for private counsel. During the hearing on the state's motion to vacate Guido's appointment, Jermyn testified concerning his finances and the appropriateness of the appointment of the Public Defender. Trial Tr. V.1, at 240a–249a. It is clear from the transcript that Jermyn was able to communicate with counsel, as he provided detailed answers to several questions concerning his finances and his ability to hire a private attorney. *See, e.g., Thompson v. Wainwright*, 787 F.2d 1447, 1458 (11th Cir.1986) (finding that defendant gave many correct responses to court's numerous questions, and one incorrect response did not give rise to reasonable doubt as to defendant's competency); *cf. Loyola–Dominguez*, 125 F.3d at 1319 (noting that defendant's responses to questions suggested that he did not understand nature of proceedings and was unable to assist in his defense); *Moran v. Godinez*, 972 F.2d 263, 265 (9th Cir.1992) (noting that defendant's monosyllabic responses to court's inquiry indicated an inability to understand the proceedings), *rev'd on other grounds*, 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), *aff'd in relevant part on remand*, 57 F.3d 690 (9th Cir.1995). Though we cannot know for certain what Jermyn's demeanor was while he testified at the pretrial hearing, we

dant's history of irrational behavior was sufficient to require the trial court to hold a competency hearing, that history was accompanied by an unequivocal expressed doubt—from both trial counsel and other individuals

close to the defendant—about the defendant's competence to stand trial. Here, the converse occurred; trial counsel made no effort to express any doubt about Jermyn's competency to the trial court. *See infra*.

nevertheless note that his responses were courteous, responsive and thoughtful. *E.g.*, Trial Tr. V.1, at 249a–250a (answering "yes, sir," "no, sir" to the court and explaining that he did not seek private counsel because he had "prior commitments which [he had not] honored yet"). Moreover, Jermyn's answers indicate that he was not confused by the examination or its purpose, and he had no difficulty assisting counsel in attempting to convince the trial court that his income and expenses prohibited him from retaining private counsel. *See* Trial Tr. V.1, at 241a–250a.

 We also note in this regard that, at the hearing on Jermyn's motion to dismiss the indictment pursuant to Pa. R.Crim. P. 1100, Jermyn appeared before the trial court and testified in a manner that supports the conclusion that he appeared capable of understanding the proceedings and assisting counsel with his defense. The Rule 1100 hearing occurred on August 6, 1985, eight days before voir dire commenced. During the hearing, Jermyn's responses to Lysaght's questions demonstrate that he was lucid, able to understand counsel's questions, and capable of assisting counsel in presenting an argument as to why his speedy trial rights had been violated by his previous counsel's decision to seek a continuance in order to secure a psychiatric evaluation by Dr. Hume. In particular, Jermyn recounted his

statement to Edward Guido, Esq., that he did not want him to seek a continuance because he "felt the D.A.'s office did not have a case" against him. Trial Tr. V.1., at 347a. His testimony further exhibited his ability to make decisions regarding the appropriate strategy that his defense counsel was to take, as he informed the trial court that he wanted the option of presenting an insanity defense, because, in his view, if he could not secure a verdict of innocence, he could win on the defense of insanity. Trial Tr. V.1, at 352a. In short, Jermyn's behavior and his testimony, which occurred in close proximity to the trial proceedings, was not such that it should have alerted the trial court to the likelihood that he was incompetent. Thus, although Jermyn exhibited some strange behavior prior to and during the trial, on balance, the trial court's contact with Jermyn would not necessarily have suggested that he was legally incompetent.[16]

 Furthermore, unlike the circumstances in *Drope*, the trial court in the instant case did not have a psychiatric report in its possession that provided crucial information indicating that Jermyn could have been unable to assist in his own defense. As the Court explained in *Drope*, "any prior medical opinion on competence to stand trial[is] ... relevant in determining whether further inquiry is required." *Drope*, 420 U.S. at 180, 95 S.Ct. 896. In

16. We recognize that the trial court has a continuing obligation to assess the defendant's competency, and that proof tending to establish that a defendant was competent at one stage of the proceedings does not preclude the possibility that changed circumstances might instill doubt about his competence. *See Drope*, 420 U.S. at 180, 95 S.Ct. 896 (finding that defendant was entitled to competency hearing based on events that occurred during trial, even if the pretrial showing was insufficient to conclude that it raised a bona fide doubt as to the defendant's competence). However, Jermyn's pretrial inter-

actions certainly are part of the overall picture before the trial court during the relevant time period, and in that sense, we believe that his conduct throughout the entire course of the proceedings must be considered in determining if there were sufficient indicia of incompetence to warrant further inquiry. *See id.* at 180, 95 S.Ct. 896 (noting that aggregate of information, including that available prior to trial and during the trial, was sufficient to raise doubt as to defendant's competency). Moreover, we do not believe that later events cast any doubt on Jermyn's competency.

*Drope*, while the psychiatric report that the trial court possessed did not provide an ultimate opinion on the issue of Jermyn's competence, it contained notations that suggested that the defendant's competence was questionable. For example, the examiner noted, among other things, that the defendant in *Drope* was cooperative in the examination but "had difficulty in participating well," "had a difficult time relating," and "was markedly circumstantial and irrelevant in his speech." *Id.* at 164 n. 1 & 175, 95 S.Ct. 896. These observations could be interpreted as indicating that the patient experienced difficulty in communicating, which in turn could bear on the defendant's competency to stand trial. *E.g., United States v. Renfroe*, 825 F.2d 763, 767 (3d Cir.1987) (finding that defendant was entitled to competency hearing when court knew that defendant used cocaine immediately prior to the trial and physician testified that cocaine addiction would affect a defendant's capacity to confer effectively with counsel, and that there was a "real question" in his mind as to whether the defendant could effectively focus and assist counsel).

By contrast, our review of the record confirms that the trial court did not possess any psychiatric report addressing the issue of Jermyn's competence. The court's psychiatric information came from the V.A. records and from Dr. Phillips' testimony at trial. But the V.A. entries recorded impressions from the past, and in that sense, the records were not that helpful in drawing conclusions about Jermyn's mental capabilities and communication abilities at or around the time of trial.[17] Similarly, Dr. Phillips' trial testimony was of little assistance; while it is true that he met with Jermyn and evaluated him just prior to trial, Dr. Phillips' testimony did not provide the court with observations bearing on Jermyn's mental and communication abilities, and Dr. Phillips' testimony relayed only a few statements that Jermyn made during the examination.[18] Thus, unlike the report the trial court possessed in *Drope*, Dr. Phillips' testimony concerning Jermyn's mental illness and his symptoms did not provide the same sort of insight into Jermyn's present communication and comprehension abilities that could have been understood by the trial court as indicating that Jermyn might not be able to understand the nature of the proceedings against him or be able to communicate with counsel and assist in his own defense. *See Drope*, 420 U.S. at 175–76, 95 S.Ct. 896; *see also Hull*, 190 F.3d at 111 (stating that trial counsel was ineffective for failing to "express doubt" about defendant's competence by cross-examining witness at competency hearing; court noted that state presented only one witness who testified that the once-adjudicated incompetent defendant was now competent, and that several reports had found that he was incompetent to stand trial within months of the competency hearing); *Renfroe*, 825 F.2d at 767 (noting physician's testimony that cocaine addiction would affect defendant's capacity to communicate and assist with counsel).

17. Also, while the V.A. records were admitted as an exhibit during the trial, the extent to which the trial court actually had occasion to review the entries is not clear from the record. The record further does not indicate whether the V.A. records were provided to the court prior to the trial.

18. The specific statement that Jermyn made during the psychiatric examination that Dr. Phillips relayed to the Court was that he believed he was a "fidget of god," *i.e.*, a person with a special relationship with God. Trial Tr. V.2, at 728a. While that statement certainly supports Jermyn's contention that he is mentally ill and was perhaps insane at the time of the murder, it does not necessarily indicate that Jermyn's communication or comprehension capabilities were impaired.

■ Furthermore, as we previously mentioned, critical to our analysis is the fact that Jermyn's trial counsel did not express any concern to the trial court concerning Jermyn's competency during any stage of the proceeding. While the trial court ultimately has the obligation to order a competency hearing or evaluation on its own motion even where the defendant does not request one if there are sufficient indicia of incompetence, as the Supreme Court explained in *Drope*, "an expressed doubt[about the defendant's competence] by one with 'the closest contact with the defendant,' *Pate v. Robinson*, 383 U.S. 375, 391, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) (Harlan, J. dissenting), is unquestionably a factor which should be considered" in determining if further inquiry by the court is required. *Drope*, 420 U.S. at 177 n. 13, 95 S.Ct. 896; *see also Medina v. California*, 505 U.S. 437, 450, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (observing that "the defendant's inability to assist counsel can, in and of itself, constitute probative evidence of incompetence, and defense counsel will often have the best-informed view of the defendant's ability to participate in his defense"). In *Robinson*, the Court expressly pointed out that "counsel throughout the proceedings insisted that Robinson's present sanity [*i.e.*, competency] was very much in issue" by expressing doubt as to the defendant's present competency and presenting ample testimony supporting his position. *Pate*, 383 U.S. at 384, 86 S.Ct. 836. Similarly, in *Drope*, the Court noted that defense counsel flagged the issue of the defendant's incompetence for the trial court when he filed a motion seeking a continuance, attached a psychiat-

ric report containing impressions bearing on the competency issue, and stated to the court that "the defendant was not a person of sound mind and should have a further psychiatric examination before the case should be forced to trial." *Drope*, 420 U.S. at 177, 95 S.Ct. 896.

■ Here, by contrast, it is undisputed that trial counsel did not raise the issue of Jermyn's possible incompetency to the trial court, and he did not, at any time, express any doubts about Jermyn's ability to communicate or assist in his own defense. Jermyn has not cited, nor have we found, any statements by counsel in the trial transcripts that, either explicitly or implicitly, convey that counsel believed that Jermyn was unable to understand what was happening, communicate with counsel, or assist in preparing his defense prior to, or during, the trial proceedings.[19] This is critical because, as the Court recognized in *Drope*, at least where the defendant's competency is involved, "judges must depend to some extent on counsel to bring issues into focus." *Id*. at 176–77, 95 S.Ct. 896. We too have noted that "defense counsel has a special role in effectively ensuring that a client is competent to stand trial." *Hull*, 190 F.3d at 112.

Furthermore, the information that the trial court possessed on the subject of Jermyn's possible incompetence more likely conveyed the opposite impression to the court—namely, that counsel did not believe, based on the information that he possessed, that there was a basis for urging that there was a reason to doubt Jermyn's competence to stand trial. Based on the pretrial submissions, the trial court

---

**19.** Jermyn cites Lysaght's PCRA testimony in which he noted Jermyn's bizarre behavior and delusional thoughts, and admitted that "[i]t was very difficult, if not impossible, for me to have what I would perceive as a logical, orderly, help me out with this, Freddie, type of conversation." App. 9, at 155–57. These expressions of concern, however, came much too late; there has been no showing that Lysaght made his feelings or impressions known to the trial court prior to, or during, the trial.

knew that Jermyn's first attorney, Edward Guido, Esq., filed a notice of an insanity defense and named John Hume, M.D. as a possible witness. Trial Tr. V.1, at 209a. Moreover, the court knew that Guido sought and received a continuance of the trial date based on his assertion that Hume had been retained to evaluate Jermyn's competency to stand trial, but he needed additional time complete his psychiatric examination. *Id.* at 225a. At the subsequent Rule 1100 hearing, Jermyn's newly retained private counsel, Gary Lysaght, Esq., questioned Guido about the reasons for the delay in proceeding to trial, and Guido confirmed that he received a report from Hume that addressed the issue of Jermyn's competency. Then, during Dr. Phillips' cross-examination, he acknowledged that he received and reviewed Dr. Hume's psychiatric report, and he confirmed that the report provided an opinion with respect to Jermyn's competency to stand trial.

Based on Guido's actions and his testimony at the Rule 1100 hearing, and Dr. Phillips' testimony on cross-examination, the trial court knew that Jermyn's counsel had explored the topic of Jermyn's competence to stand trial, but had not raised that issue with the court at any stage of the proceedings. The court also was made aware, based on prior counsel's testimony, that Hume met with Jermyn on more than one occasion in order to make an informed assessment as to Jermyn's competency to stand trial. While it does not appear from the record that the substance of the report was ever revealed to the trial court, given counsel's inquiry and course of action—or more appropriately, counsel's inaction vis-a-vis the trial court—we think it is fair to say that the information that the trial court possessed pointed more directly to the conclusion that counsel was satisfied that Jermyn was competent to stand trial,

based on the results of the Hume report and his interaction with Jermyn himself.

We are mindful that, according to Supreme Court precedent, "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence" are relevant considerations in determining whether the trial court should inquire into the defendant's competence on its own motion, and that "even one of these factors, standing alone may, *in some circumstances*, be sufficient." *Drope*, 420 U.S. at 180, 95 S.Ct. 896 (emphasis added). However, in *these* circumstances, where there were no medical opinions on competency submitted to the trial court, no signs from trial counsel that the defendant's competence was in doubt in his view, and the defendant's behavior, while strange, was not sufficiently indicative of an individual who was incapable of understanding the nature of the proceedings, communicating with counsel or assisting in his defense, we do not believe that the information the trial court possessed was enough to conclude that it should have ordered a competency evaluation or hearing on its own motion. Accordingly, we will affirm the District Court's disposition of Jermyn's due process claim.

### 3. Counsel's Ineffectiveness in Failing to Seek Competency Evaluation or Hearing

Jermyn also claims that his attorney was ineffective in failing to seek a competency evaluation or hearing prior to, or during, the trial, and that he was prejudiced by this error because there is a reasonable probability that, if such an inquiry had been made, he would have been found incompetent to stand trial. Jermyn argues that, given the various indicia of incompetence that counsel knew of, he should have brought the issue of Jermyn's

competency to the trial court's attention, and should have requested a competency examination or hearing under Pennsylvania law.

As previously noted, the Pennsylvania Supreme Court mentioned each of Jermyn's competency-related arguments, although the basis for its ruling on the competency-related ineffectiveness claim is difficult to understand. The Pennsylvania Supreme Court's decision seems to have based its ruling on the PCRA court's analysis. It stated that "[t]he PCRA court concluded that there was no merit to Jermyn's contentions that defense counsel was ineffective for failing to bring to the attention of the trial court Jermyn's incompetency to stand trial.... We agree with the PCRA Court." *Commonwealth v. Jermyn*, 709 A.2d at 862. However, the Pennsylvania Supreme Court's reliance on the PCRA court's analysis is problematic, because the PCRA court's opinion does not specifically address Jermyn's competency-related ineffectiveness claim. Rather, the PCRA court appears to have interpreted Jermyn's competency-related claim as predicated solely on the related, but legally distinct, issue of whether the trial court erred in not ordering a competency hearing or evaluation on its own motion.[20]

Similarly, the District Court did not specifically address the merits of Jermyn's argument that counsel was ineffective for failing to raise the issue of Jermyn's incompetence by seeking a court-ordered competency hearing or evaluation. The District Court seems to have taken the same route as the PCRA court and interpreted Jermyn's competency claim as predicated solely on the theory that he was denied due process because of the trial court's failure to order a hearing on its own motion. *See Jermyn v. Horn*, 1998 WL 754567, at *23.

 While Jermyn did not make this point in his brief, we believe that the Pennsylvania Supreme Court's disposition of Jermyn's competency-related ineffectiveness claim is tantamount to its having not addressed the merits of that claim at all, given that it expressly relied on the PCRA court's adjudication of the issue.[21] Where the state supreme court fails to adjudicate a habeas petitioner's claim on

---

20. The sum total of the PCRA court's reasoning on the competency-related issues is as follows:

 IV. *A NEW TRIAL IS NOT WARRANTED BASED ON THE CLAIM THAT PETITIONER WAS NOT AFFORDED A COMPETENCY HEARING AT TRIAL*

 No competency hearing was requested by the defense before or during trial. Paul F. Phillips, M.D., the psychiatrist who testified for the defense at trial, was called by petitioner as a witness in this post-conviction proceeding. No evidence was elicited from Dr. Phillips that petitioner was not competent to stand trial in August, 1985. Petitioner now argues that his behavior at trial should have prompted the trial judge to interrupt the trial and order a competency hearing *sua sponte*. There is merit to that argument, and no miscarriage of justice occurred.

 PCRA Op. at 13–14.

21. While dicta in our opinion in *Hull*, 190 F.3d at 101 n. 4, observed in passing that the Pennsylvania Supreme Court's opinion in *Jermyn* addressed the merits of Jermyn's competency-related ineffectiveness claim in determining if a "miscarriage of justice" occurred, our thorough review of the proceedings in this case leads us to conclude that we may have overstated what actually happened. In *Hull*, our observation on this point was based on the fact that the Pennsylvania Supreme Court's opinion expressly stated that it agreed with the PCRA court's analysis of the merits of that claim, but we obviously did not know, as we do now, that the PCRA court did not actually ever address the competency-related ineffectiveness claim. It is the Pennsylvania Supreme Court's reliance on a non-existent merits analysis by the PCRA court that forms the basis for our conclusion that the state courts never adjudicated this claim on the merits.

the merits, we have held that AEDPA's deferential standards are inapplicable. *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) (finding that state courts mischaracterized petitioner's claim as based on ineffective assistance of counsel rather than a constructive denial of counsel, and thus, petitioner's claim had not been adjudicated properly on the merits in state court). Thus, if the defendant properly preserves an issue but the state court does not reach the merits of the claim, pre-AEDPA review is appropriate, and we "must examine, without special heed to the underlying state court decision," whether the claim has merit. *Id.*; *see also Hameen*, 212 F.3d at 248 (stating that, because the Delaware Supreme Court did not adjudicate the petitioner's constitutional claim but rather resolved the issue by reference to Delaware law, the state court did not pass on the claim and "we exercise independent judgment"). Accordingly, we must examine independently whether Jermyn's Sixth Amendment right to effective assistance of counsel was violated by counsel's failure to seek a competency hearing or evaluation in light of what he knew at the relevant time.

▬ Clearly, an attorney would render ineffective assistance of counsel if he or she failed to inquire into a defendant's competency and failed to request a competency hearing, despite indicia of incompetence that would provide reasonable counsel "reason to doubt" the defendant's ability to understand the proceedings, communicate with counsel, and assist in his own defense. *E.g., Hull*, 190 F.3d at 106 (stating that a defendant would be prejudiced if there was reason to doubt the defendant's competence and counsel fails to request hearing); *Hull v. Freeman*, 932 F.2d 159, 169 (3d Cir.1991) (stating that counsel has independent professional responsibility to "put government to its proofs" at competency hearing when there

is a serious doubt as to defendant's competence), *overruled on other grounds as stated in Caswell v. Ryan*, 953 F.2d 853, 859 (3d Cir.1992). Thus, we must consider whether there were such "indicia" so that, in failing to request a competency hearing or evaluation on behalf of Jermyn, *see* Pa. Stat. Ann. tit. 50, § 7402(d), counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 668, 690, 104 S.Ct. 2052. This can only be assessed by examining what counsel did, and what facts counsel knew that would bear on the issue of Jermyn's competency to stand trial. *See Strickland*, 466 U.S. at 690, 104 S.Ct. 2052 ("[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.").

The crux of Jermyn's claim, as it has been presented to us, is that counsel sat idly by without recognizing that Jermyn was incompetent to stand trial, or at a minimum, that there were reasons to doubt his competence. *See* Jermyn's Initial Br. at 146 (stating that counsel's performance was deficient because he failed to bring substantial indicia of incompetency to court's attention and failed to request competency hearing); Jermyn's Reply Br. at 134 (arguing that Jermyn should be afforded a new trial because, *inter alia*, "counsel failed to request a competency hearing or take any action on the competency issue"). However, based on the present record, we cannot agree with Jermyn's claim that counsel's failure to seek a hearing or evaluation constituted deficient performance under *Strickland*. As we have explained, our review of the trial transcript reveals that Jermyn's counsel did not utterly fail to recognize that there was a question as to whether he was incompetent to stand trial. Rather, the record reveals that Jermyn's first attorney,

Edward Guido, retained John Hume, M.D., and that Dr. Hume examined Jermyn at Guido's request before he was removed from the case. The record also confirms that Hume provided counsel with a report that rendered an opinion as to Jermyn's competence to stand trial. While Guido's Rule 1100 testimony does not specifically tell us that Lysaght possessed the report and reviewed it, a fair reading of the record confirms that Lysaght was aware of its contents. After all, Lysaght examined Guido during the Rule 1100 hearing, and Guido made specific reference to the existence of (although not the contents of) Hume's evaluation. Moreover, Lysaght retained Dr. Phillips to testify on Jermyn's behalf long after Guido completed his representation of Jermyn, Dr. Phillips testified on cross-examination that he reviewed Dr. Hume's report on competency, and both Lysaght and Dr. Phillips confirmed during the PCRA proceedings that they conferred about Jermyn's case. The logical inference from the record is that Dr. Phillips received the competency evaluation from Lysaght, who had received it from Guido when his appointment was vacated by the trial court.

Thus, in order for us to find that Lysaght was ineffective for not seeking a court-ordered evaluation or hearing, Jermyn would have to recharacterize his competency-related ineffectiveness claim. Specifically, rather than claiming that counsel was ineffective for failing to perceive that there was a potential problem and for failing to seek a competency hearing or evaluation from the court, Jermyn's revised theory would have to be that, based on the information contained in Dr. Hume's competency evaluations, and Lysaght's own knowledge concerning Jermyn's behavior and communication abilities, there was sufficient reason to doubt his competency such that Lysaght should have sought another evaluation or a hearing from the trial court under Pa. Stat. Ann., tit. 50, § 7402(d). However, we simply cannot draw that conclusion based on the present record because we are unable to determine what Hume's impressions were on the issue of Jermyn's competency to stand trial.[22] Dr. Hume's report itself is

---

**22.** Originally, neither the Commonwealth nor Jermyn's counsel informed us that the record confirmed that there actually had been a competency evaluation performed by Dr. Hume at the behest of defense counsel. We discovered this fact after reviewing the transcripts of the original pretrial and trial proceedings, and sought the parties' guidance as to their understanding of what had occurred during trial. Thus, we asked the parties to "confirm whether the record reflect[ed] ... the opinion or report regarding the petitioner's competency to stand trial by Dr. Hume referenced at pages 341a and 739a–40a," and "if so, [whether] the record reflect[s] whether those opinions and/or reports were shared with trial counsel...." We did not ask for extra-record information, and we did not seek the reports themselves. In response to our inquiry, both the Commonwealth and Jermyn's counsel confirmed our initial findings—that the record did not contain Dr. Hume's report, does not indicate the contents of his report, but

does indicate that counsel possessed the report. Jermyn's counsel informed us that Dr. Hume actually authored two reports that addressed the issue of petitioner's competency.

In addition to providing this information, Jermyn's counsel included Dr. Hume's reports for our review. The Commonwealth has objected to our considering the reports, and it urges us to rule on the basis of the current record. In contrast, Jermyn's counsel asks us to review those reports, make them part of our record, and rule on Jermyn's ineffectiveness in light of those reports. However, Jermyn's counsel clearly exceeded the scope of our inquiry, and we decline the invitation to supplement the record before us at this juncture, as we are engaged in habeas review of the state court proceedings in which such reports were never made part of the record. Moreover, the reports were not included in the habeas record submitted before the District Court. Accordingly, we will de-

not in the trial record or the record compiled during the habeas proceedings in the state courts and the District Court. And, as we previously mentioned, it does not appear that the report was ever presented to the trial court at any stage of the proceedings.

Based on the current record before us, what we do know is that counsel acted on his client's behalf in obtaining a competency evaluation from Dr. Hume, and that Dr. Hume did, in fact, evaluate Jermyn and provide an opinion addressing his competence to stand trial. Given the fact that counsel did not sit idly by while not even recognizing that there was a potential problem, we must presume, based on the information properly before us, that counsel's failure to seek another court-ordered evaluation or a competency hearing was based on the contents of the report and a strategic decision that no further inquiry was necessary. The record simply supports no other conclusion.

We have not overlooked Lysaght's testimony at the PCRA hearing in which he indicated that he had difficulties communicating with, and relating to, Jermyn. App. 9, at 154a–157a. While Lysaght's testimony in this regard—to the effect that he did not have normal, orderly conversations with Jermyn—definitely would have advanced Jermyn's initial theory that counsel was ineffective for not conducting any inquiry into defendant's competence to stand trial, given that the record confirms that counsel *did* seek a medical opinion on that issue, the question is now whether Lysaght's description of the apparent disconnect between them shows that there was reason to doubt Jermyn's competence even after Lysaght obtained and reviewed Hume's report and his impressions. Given

that the inquiry is focused as such, we do not believe that the record as a whole demonstrates that Lysaght was ineffective because he should have done more than he did. Even with Lysaght's PCRA testimony, we simply cannot conclude that Lysaght possessed sufficient information to cast doubt upon Jermyn's competency to stand trial without knowing what Hume's professional observations and impressions were regarding that issue.

In *Strickland*, the Court stated:

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (internal quotation marks omitted). Here, Jermyn has not met his burden of demonstrating to us, based on the current record, that counsel was ineffective because he should have pursued the competency matter further than he did. Moreover, lacking such reports in the record, we certainly cannot conclude—as we would need to find as part of the prejudice inquiry under *Strickland*—that there was a reasonable probability that Jermyn would have been adjudged incompetent to stand trial if a hearing or additional evaluation had been conducted.[23] Accordingly, we will affirm

cide this appeal based on the record originally presented to us.

**23.** Here too, Lysaght's professed difficulty in communicating with Jermyn, while relevant

the District Court's ruling that Jermyn is not entitled to habeas relief on his claim that Lysaght was ineffective for failing to raise the question of Jermyn's incompetence before the court by seeking a competency hearing or additional evaluation.

### C. *Jermyn's Penalty Phase Claim of Ineffective Assistance of Counsel*

As we have explained, the Commonwealth's appeal pertains to the District Court's grant of habeas relief on the grounds that counsel was ineffective in investigating and presenting mitigating evidence to the jury. The PCRA court and the Pennsylvania Supreme Court rejected Jermyn's claim that counsel was ineffective at the sentencing hearing, but the District Court reached the opposite conclusion. In order to assess whether the state courts unreasonably applied *Strickland* based on the trial record, our starting point is the state court's adjudication of the claim. As the PCRA court addressed this question in some detail in its opinion denying relief, we will begin with a discussion of the PCRA court's opinion before addressing the Pennsylvania Supreme Court's analysis and the District Court's decision to grant relief.

The PCRA court's analysis recounted in some detail the evidence that was presented at the PCRA hearing that had not been presented during the penalty phase. The Court found Sharon Isralow and her mother to be compelling and credible witnesses. It recognized that both witnesses testified that Jermyn had been subjected to horrible mistreatment and abuse by his father, and that his mother was unable to protect

him from her husband. The Court also noted that counsel did not attempt to contact Sharon Isralow or her mother, and that counsel presented no reason for failing to investigate Jermyn's past. The Court also pointed to Dr. Phillips' testimony that he had attempted to explain to Jermyn's counsel the importance of Jermyn's childhood on the development of his mental illness, but that counsel did not pay sufficient attention to him. It also noted counsel's admission that he should have had Dr. Phillips testify during the penalty phase, but that he was overwhelmed by the penalty phase and inadequately prepared. Finally, the Court referred to testimony by other mental health experts stating that the childhood abuse Jermyn suffered as a child contributed significantly to his mental illness as an adult. PCRA Op. at 23–29.

The PCRA court then considered the strength of the evidence that actually was presented during the trial. It summarized Reverend Falk's testimony, and referenced the statements in counsel's closing argument that also touched upon the abuse and lack of love in Jermyn's family. Additionally, it noted that counsel had presented two witnesses at the penalty phase (as opposed to putting on no defense at all), and had given the jury the V.A. records documenting Jermyn's mental health history. Based on this evidence, the PCRA court concluded that Jermyn failed to establish that he had been prejudiced by counsel's actions:

> Given the roots of petitioner's mental illness, we conclude that the jury *might*

to the prejudice inquiry under *Strickland,* is not sufficient to form a basis for concluding that there exists a reasonable probability that he would have been adjudged to have been incompetent if further inquiry had been made. This is especially so given indications in the record that Jermyn was, in fact, aware

of the proceedings and willing and able to assist in his defense. *E.g.,* App. 10, at 152 (Lysaght testifying at PCRA hearing that Jermyn "directed" his defense and told counsel to pursue straight "not guilty" verdict and an insanity defense as an alternative).

have rendered a verdict of life imprisonment had trial counsel introduced more detailed evidence of petitioner's abused and traumatic childhood, and the supporting opinions of Dr. Phillips. However, given what the jury did know about that childhood and the mental health history of petitioner, and given the vigorous closing argument of trial counsel with respect to those mitigation issues, to say that there is a *reasonable probability* that but for the omissions of trial counsel the outcome of the penalty phase would have been different, is not something that we can conclude.

PCRA Op. at 37.

The Pennsylvania Supreme Court agreed with the PCRA court's analysis:

The PCRA court's conclusion that the outcome of the penalty phase of Jermyn's trial might have been different had more mitigating evidence been offered does not render legally erroneous the PCRA court's conclusion that, although this possibility exists, it is not a reasonable probability. *While the testimony which Jermyn would now like to have seen offered would have provided the jury with more detailed incidents of his childhood trauma and his mental illness, defense counsel presented the jury with ample evidence to make the jury aware of the considerations of Jermyn's traumatic childhood and his mental illness.* As Jermyn's counsel reminded the jury in his closing argument at the penalty phase, they had heard a great deal of testimony regarding Jermyn's traumatic childhood at the hands of his parents and about his mental illness. Given all of the mitigating evidence presented by Jermyn's trial counsel at the penalty hearing and his vigorous efforts to defend Jermyn in this case, we find no legal error on the part of the PCRA court....

*Commonwealth v. Jermyn*, 709 A.2d at 858–59 (emphasis added).

The District Court disagreed with the Pennsylvania Supreme Court's analysis of Jermyn's ineffectiveness claim, finding that it was based on an incorrect view of the nature and quantum of mitigating evidence presented at Jermyn's trial. According to the District Court, the Pennsylvania Supreme Court's prejudice analysis rested upon its erroneous findings that: (1) the jury had "ample evidence" of Jermyn's "traumatic childhood"; (2) counsel presented a "great deal" of mitigating evidence; and (3) counsel's efforts in defending Jermyn were "vigorous[ ]." Rather than accepting the state court's view of the record, the District Court engaged in an independent review of the trial evidence and PCRA testimony presented to determine if Jermyn had been prejudiced by counsel's actions. Ultimately it concluded that habeas relief was appropriate under § 2254(d)(2) because the state court had unreasonably determined the facts, and, based on that error, had incorrectly found that Jermyn was not prejudiced by the omission of the evidence developed at the PCRA hearing. *Jermyn v. Horn*, 1998 WL 754567, at *13–17.

To demonstrate why the state court's factual determinations were, in its view, "unreasonable," the District Court recounted all of the evidence presented at trial. It then concluded that counsel utterly failed to introduce evidence at trial concerning the abuse Jermyn suffered as a child. It determined that the portions of the V.A. records that the defense referenced merely confirmed that Jermyn was mentally ill. The Court also discounted the references in Falk's testimony to the fact that Jermyn's father abused him, because "a fair summary" of the testimony was that, "while Jermyn's father beat him on a weekly basis, it was only to discipline

him because of the power struggles within the family." It also noted that Falk's testimony gave the impression that Jermyn was sent away to Scotland School because of his misconduct. The Court remarked that "this testimony leaves the distinct impression that Jermyn was a problem child who challenged his parents' authority, who needed corporal punishment on a weekly basis, and who forced his parents to send him away to school." *Id.* at *15.

After considering and rejecting the Pennsylvania Supreme Court's characterization of the omitted evidence as merely providing "more detailed" information concerning Jermyn's troubled childhood, the Court turned to an application of *Strickland* based on the record. The Court found both that counsel had been ineffective in not investigating and presenting the available mitigating evidence, and that those errors had been prejudicial to Jermyn's defense at the penalty phase. It reasoned:

> The first part of the test is satisfied because trial counsel made a serious error in not investigating the childhood abuse. Counsel had no tactical or strategic reason for not doing so. This is not a case where counsel performed some investigation and then decided that the childhood abuse issue should not be further explored. He simply failed to investigate. Moreover, the Commonwealth has not suggested any tactical reason for counsel's conduct either.

> The second part [of *Strickland*] is satisfied because there is a reasonable probability that the jury, if it had heard this powerful evidence, would have concluded that the balance of aggravating and mitigating factors did not warrant death. In Pennsylvania, the jury's sentence of death has to be unanimous, ... and the balancing of aggravating cir-

cumstances with mitigating circumstances is not a simple arithmetic process, ... so if Jermyn had convinced just one juror that the childhood abuse was a sufficiently mitigating factor in combination with the other mitigating factors to overcome the sole aggravating factor, he would have received a life sentence.

*Id.* at *16. The Court concluded its analysis by rejecting the Commonwealth's suggestion that counsel's error was best characterized as the failure to "present all available mitigating evidence." It explained that "[p]resentation of some mitigating evidence does not excuse the failure to provide evidence of different mitigating circumstances." *Id.* at *17.

■ We agree with the District Court's ultimate conclusion that Jermyn is entitled to habeas relief because his trial counsel was constitutionally deficient for failing to investigate or present testimonial or documentary evidence concerning the severe nature of the childhood abuse Jermyn suffered, his mother's role in the home at that time, and the impact that the abuse had on his mental illness. We further concur in the District Court's assessment, based on the totality of available mitigating evidence, that there existed a reasonable probability that the result of the sentencing phase would have been different if the jury had heard the evidence that was presented at the PCRA proceeding. However, in reaching our result, we will analyze Jermyn's claim under 28 U.S.C. § 2254(d)(1) rather than § 2254(d)(2), as we perceive the problem with the Pennsylvania Supreme Court's analysis to be that it unreasonably applied *Strickland*'s prejudice inquiry in light of the totality of mitigating evidence adduced at trial and in the habeas proceedings.[24]

---

**24.** We think that the District Court essentially reached the same conclusion but simply

*See Williams,* 529 U.S. at 407–08, 120 S.Ct. 1495("A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involving an unreasonable application of ... clearly established Federal law.' "); *id.* (finding that the state court's decision warranted relief under § 2254(d)(1) because the state supreme court "failed to accord appropriate weight to the body of mitigating evidence available to trial counsel").

With respect to the first prong of *Strickland,* we agree with the District Court's conclusion that counsel's performance fell short of professional standards and was constitutionally deficient. Counsel was ineffective because he failed to conduct an investigation, failed to prepare adequately for the penalty phase of Jermyn's trial, and consequently, failed to present substantial mitigating evidence that would have directly undercut the state's penalty-phase case.

Counsel failed to investigate the circumstances surrounding Jermyn's childhood, even though counsel admitted at the PCRA hearing that he was aware that Jermyn had claimed that he was abused as a child. Dr. Phillips told counsel before the original trial that Jermyn had been abused as a child, and told counsel that the abuse was a critical component to understanding Jermyn's mental illness. App. 20, at ¶ 5. Nonetheless, counsel did not attempt to locate any fact witness who witnessed the abuse and could testify about it specifically.

Obviously, if counsel had engaged in minimal investigation and contacted the individual who he knew was the beneficiary in the victim's will (who incidentally was a close blood relative of Jermyn), he would have obtained powerful and, as the PCRA court noted, "credible," testimony from Sharon Isralow and her mother. Sharon Isralow's testimony was replete with firsthand accounts of instances of mental and physical abuse that Jermyn suffered at the hands of his father, and her mother's testimony corroborated her account. Counsel could have used that testimony to provide the jury with critical insight into the root of Jermyn's mental illness. The Isralows'

framed the issue a bit differently, causing it to believe that relief was appropriate under 28 U.S.C. § 2254(d)(2), rather than § 2254(d)(1). As we read the District Court's opinion, the crux of its disagreement with the Pennsylvania Supreme Court's analysis was that the state court failed to appreciate the gulf between the evidence presented at trial (and how it had been developed before the jury) and the evidence adduced at the PCRA hearing, and that its error in that regard resulted in a conclusion—*i.e.,* that Jermyn was not prejudiced by counsel's actions—that was an unreasonable application of *Strickland* given what actually had occurred at trial. The passages of the Pennsylvania Supreme Court's opinion that the District Court quoted as "factual conclusions" actually are statements that are part of the court's articulation of its legal analysis of the ineffectiveness claim. While the District Court perceived the issue it decided as "factual" in the sense that its legal analysis was predicated on its view of the nature of the evidence presented, its decision was not the product of disagreement with a state court finding of historical fact, a matter that clearly would be the subject of relief under § 2254(d)(2). *E.g., Campbell v. Vaughn,* 209 F.3d 280, 291 (3d Cir.2000) (holding that state court's finding of historical fact that counsel informed petitioner of right to testify was not "unreasonable" and petitioner was not entitled relief under § 2254(d)(2)); *Berryman,* 100 F.3d at 1104 (stating that a finding that counsel lacked strategy would be subject to analysis under § 2254(d)(2)). At all events, we believe that the District Court was correct in its view of the totality of mitigating evidence available and its conclusion that it was reasonably probable that the outcome of the sentencing proceeding would have been different had counsel done an adequate investigation and presentation.

testimony also offered valuable insight into Jermyn's mother's role in the household, and how she failed to intervene on Jermyn's behalf. Evidence of that type was not presented at the trial, but it certainly would have been helpful to the defense in perhaps explaining why Jermyn had problems with his mother.

Instead, Jermyn's counsel introduced the testimony of Reverend Falk, who could barely testify about Jermyn's childhood. Ultimately, Reverend Falk's testimony was unhelpful to Jermyn, which was not surprising in view of the fact that he advised the defense prior to trial that he had only limited recollection of Jermyn's childhood and had not been a first-hand witness to any of the abuse. We agree with the District Court's assessment that his testimony was particularly damaging because, on the whole, it actually portrayed Jermyn as a difficult child whose parents utilized corporal punishment to control his behavior. The substance of his testimony did not convey in any way the horrific picture that the Isralows' testimony provided concerning the constant and unprovoked childhood abuse Jermyn suffered. On balance, Reverend Falk's testimony probably did more harm for Jermyn than good.

Counsel also failed to obtain and present evidence pertaining to Jermyn's residence at the Scotland School. Counsel testified at the PCRA hearing that he knew that Jermyn's mother sent him away to that boarding school, and counsel stated that he believed that it was a school for "orphans" or "unwanted" children. App. 9, at 129. Even though both of Jermyn's parents were still living when he went to school there, counsel chose not to pursue why they sent him away to boarding school, and consequently presented no information on that subject during the penalty phase of the trial. He also did not seek to obtain records from the school which corroborate

the fact that Jermyn was abused as a child, and that his mother did not intervene on his behalf. *See generally* App. 24 ("He [Jermyn's father] openly states that the boy must go because if he stays, he is afraid of what he might do."); *id.* ("[Jermyn's mother] is a pathetic figure. She and the boy are obviously very much afraid of this 'cripple.' She tried to explain his violent temper and his hatred and mistreatment for the boy tacitly, but was quickly squelched."); *id.* ("[Jermyn's mother] is torn between loyalty and need for both the father and son but is unable to move away from her husband."). This latter information, of course, would have been relevant to determining the nature of Jermyn's relationship with his mother. It would have shown the jury that Jermyn's mother sent him away before, and was about to do the same thing again by evicting him.

The problems presented by counsel's inadequate investigation were compounded by his actual performance during the penalty phase. Dr. Phillips testified at the PCRA hearing that he told counsel about several specific instances of abuse that he learned about from Jermyn during their meeting. Dr. Phillips informed counsel that during Jermyn's childhood, his father often: (1) hung Jermyn by his heels; (2) beat Jermyn with cat-o-nine tails; and (3) chained Jermyn in the attic and made him eat from a dog food bowl. App. 10, at 46. While Dr. Phillips expected to be called to testify at the penalty phase and could have recounted what Jermyn had described to him and how it impacted upon Jermyn's adult functioning and his culpability, counsel did not call him, or any other mental health expert, as a witness at the penalty phase. Consequently, the jury never heard about these specific instances of abuse, and never heard psychiatric testimony explaining how Jermyn's development was thwarted by the torture and

psychological abuse he suffered as a child. Instead, counsel presented two witnesses during the penalty phase who offered the jury with little reason to spare Jermyn's life.

We recognize, of course, that "[t]he right to counsel does not require that a criminal defense attorney leave no stone unturned and no witness unpursued.... [H]owever, ... it does require a reasoned judgment as to the amount of investigation the particular circumstances of a given case require." *Berryman*, 100 F.3d at 1101. As the Court stated in *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations in investigation." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. As we have explained, Lysaght practically concedes that his course of conduct was not based on his exercise of sound professional judgment. He confirmed at the PCRA hearing that he had no tactical reason for failing to investigate the allegations of childhood abuse, failing to obtain the Scotland School records, and failing to call Dr. Phillips and the Isralows as witnesses during the penalty phase. He had been out of law school for less than two years, this was his first capital case, and he was "overwhelmed" by the entire matter.

Moreover, as in *Williams v. Taylor*, the record confirms that Jermyn's counsel did not begin to prepare for the penalty phase in a timely fashion. In fact, the circumstances of this case are even more egregious than in *Williams*, as the trial attorney in *Williams* at least started planning for that phase of the proceeding within a week prior to trial. *Williams*, 529 U.S. at 395, 120 S.Ct. 1495. Here, by contrast, Jermyn's counsel and his law clerk admit-

ted that they began preparing for the penalty phase the night before it began. App. 20, at ¶ 4. Indeed, counsel's law clerk testified at the PCRA hearing that after the guilty verdict was rendered late on a Friday afternoon, counsel asked him to "try to arrange for some mercy witnesses to be there the next morning." App. 9, at 167. Given that the sentencing phase of a capital case often is the stage of the proceedings "where counsel can do his or her client the most good," *Glenn v. Tate*, 71 F.3d 1204, 1207 (6th Cir.1995), counsel's belated, eleventh-hour preparation for the penalty phase fell short of objectively reasonable representation. *E.g., Blanco v. Singletary*, 943 F.2d 1477, 1501-02 (11th Cir.1991) ("To save the difficult and time consuming task of assembling mitigation witnesses until after the jury's verdict in the guilt phase almost insures that witnesses will not be available.").

In sum, the significance of the information that counsel failed to discover and present simply required more than the bare bones effort that counsel put forth. Thus, we find that Jermyn's counsel's omissions clearly demonstrate that his conduct fell below the standards required for reasonable representation of his client. *E.g., Williams*, 529 U.S. at 395, 120 S.Ct. 1495 (finding counsel ineffective because they failed to conduct an investigation that would have uncovered information graphically describing Williams' "nightmarish childhood" and the fact that he had been severely abused by his father and placed in foster care; Court noted that failure to investigate was not product of strategy); *Berryman*, 100 F.3d at 1100-01 (finding that counsel's failure to locate key witness constituted deficient performance because counsel had "ample information to suggest" that the witness was important to the defense).[25]

**25.** *See also, e.g., Dobbs v. Turpin*, 142 F.3d 1383, 1388 (11th Cir.1998) (finding that coun-

Turning to the prejudice inquiry under *Strickland*, we also conclude that counsel's failure to investigate the circumstances of Jermyn's childhood and present this powerful evidence to the jury was prejudicial to Jermyn, and that the state court's view of the prejudice prong resulted in an unreasonable application of Supreme Court precedent. Pennsylvania is a weighing state in which the jury is to determine which statutorily defined aggravating factors have been proven beyond a reasonable doubt and weigh those factors against the mitigating factors the defendant has proven by a preponderance of the evidence. *See* 42 Pa. Cons.Stat. Ann. § 9711(c)(iii),(iv). The jury's decision on the penalty must be unanimous. In this case, the trial court permitted the jury to consider only one aggravating factor, whether the defendant committed a killing within the perpetration of a felony, and the jury found it applied. *See* 42 Pa. Cons. Stat. Ann. § 9711(d)(6) ("The defendant committed a killing while in the perpetration of a felony."); Trial Tr. V.3, at 1110. The trial court permitted the jury to consider all of the possible mitigating factors. *See* 42 Pa. Cons.Stat. Ann. §§ 9711(d)(1–8). The Commonwealth stipulated to the existence of one mitigating factor—Jermyn's lack of a significant criminal history.

*See* Trial Tr. V.3, at 1110; 42 Pa. Cons. Stat. Ann. § 9711. The jury found two others: (1) Jermyn was "under the influence of extreme mental or emotional disturbance" at the time of the killing; and (2) there was "other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." *See* Trial Tr. V.3, at 1114(e); 42 Pa. Cons.Stat. Ann. § 9711(d)(1) & (8). Nonetheless, the jury sentenced Jermyn to death. Because the jury's decision must be unanimous, Jermyn can show prejudice in this case if there is a reasonable probability that the presentation of the specific and disturbing evidence of childhood abuse and neglect as a mitigating factor would have convinced one juror to find the mitigating factors to outweigh the single aggravating factor the Commonwealth relied upon in this case. We believe that such a reasonable probability exists.

As the Supreme Court stated in *Williams*, we must evaluate "the totality of the available mitigating evidence—both that adduced at trial, and the evidence adduced at the habeas proceeding—in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397, 120 S.Ct. 1495. While the jury found two relevant mitigating factors from the evidence that was presented to the jury, counsel

---

sel's failure to investigate defendant's childhood and present evidence concerning abuse and neglect by his mother constituted deficient performance); *Glenn*, 71 F.3d at 1207–08 (finding counsel's lack of investigation and preparation for the sentencing phase ineffective; counsel did not prepare for sentencing until after guilty verdict was rendered, failed to interview family members who would have testified in mitigation, and failed to obtain school and mental health records confirming that defendant had low intelligence quotient); *Antwine v. Delo*, 54 F.3d 1357, 1367 (8th Cir.1995) (holding that trial counsel was ineffective for failing to investigate defendant's mental illness and present mitigation evidence establishing that he was bipolar where

counsel knew that defendant was acting oddly and had denied using drugs on the night of the murder, even though brief mental examination attributed his behavior to PCP use); *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir.1995) (finding that counsel was ineffective for failing to investigate and present mitigating evidence of defendant's background where they had information that could have led them to witnesses who could have testified in defendant's behalf); *Brewer v. Aiken*, 935 F.2d 850, 858 (7th Cir.1991) (stating that counsel's performance was deficient when he failed to investigate and present evidence of Brewer's mental health history, low intelligence, and disadvantaged childhood).

could have presented evidence of an entirely different weight and quality to the jury. In the place of Reverend Falk's equivocal evidence of tension in the home and some periodic corporal punishment which suggested that Jermyn was to blame, Jermyn could have presented strong and specific testimony about a horrific home life in which Jermyn was physically and emotionally terrorized by his father. Rather than evidence suggesting that Jermyn was to blame for the decision to send him to the Scotland School, evidence could have been presented indicating that he was sent there in order to protect him from Jermyn's father. Given the strength of this omitted evidence, we believe that, if it had been heard by the jury, it might well have influenced its determination that the sole aggravating circumstance was outweighed by the totality of the mitigating evidence available. *E.g.*, *Clabourne v. Lewis*, 64 F.3d 1373, 1387 (9th Cir.1995) (finding prejudice in counsel's failure to present mitigating evidence to the jury because court "found only one aggravating circumstance, the weight of which would have been called into question had [counsel] presented evidence that [the co-defendant] was the mastermind behind the crime").

Moreover, the testimony of Sharon Isralow and her mother would have strengthened the evidence pertaining to Jermyn's mental illness such that it also could be said that the jury might have found that the mitigating circumstance of Jermyn's mental disturbance outweighed the sole aggravating circumstance the Commonwealth established. In response to the Commonwealth's theory that Jermyn faked the symptoms of paranoid schizophrenia, the Isralows' testimony, as credited by the PCRA court and explained by Dr. Phillips and the other mental health professionals, would have provided an objective basis for the onset of Jermyn's

mental illness. The Isralows' testimony also would have provided a personal recount of the change in Jermyn's behavior that reflected the onset of Jermyn's mental illness.

Additionally, the testimony would have provided the jury with an understanding about the relationship between Jermyn and his mother. This awareness, in turn, might have softened Jermyn's motive for her murder in the minds of the jurors, and, as in *Williams*, "might well have influenced the jury's appraisal of his moral culpability." *Williams*, 529 U.S. at 398, 120 S.Ct. 1495; *see also Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (stating that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse") (internal quotation marks omitted). The jury might have taken a different view regarding Jermyn's motive for the crime; rather than believing, as the prosecutor advanced, that the killing was motivated by greed and Jermyn's desire to continue living in his mother's house, the jury might have accepted the theory that Jermyn killed his mother because he believed, in his disturbed mind, that she was abandoning him yet again.

The Commonwealth takes the view that the failure to present the additional mitigating evidence was not prejudicial because, as the Pennsylvania Supreme Court found, "defense counsel presented the jury with ample evidence to make the jury aware of the considerations of Jermyn's traumatic childhood and his mental illness." However, the Commonwealth fails to appreciate the fact that the only evidence specifically pertaining to Jer-

myn's childhood abuse came from Reverend Falk, whose testimony, to which we have already alluded, was limited, equivocal, and misleading.[26] While the jury clearly was aware that Jermyn claimed that he suffered from a mental illness, the lack of directed and specific testimony about Jermyn's childhood and its impact on Jermyn's mental illness left the jury's awareness incomplete. *Cf. Zettlemoyer v. Fulcomer*, 923 F.2d 284, 299 (3d Cir.1991) (denying habeas relief because "there is not the slightest doubt that the jury had a very complete psychological picture of Zettlemoyer as an individual").

We therefore do not agree with the Pennsylvania Supreme Court's characterization that the evidence that could have been presented would simply "have provided the jury with more detailed incidents of his childhood trauma and mental illness." *Commonwealth v. Jermyn*, 709 A.2d at 859. Rather, the testimony would have provided the jury with an entirely different view of Jermyn's life and childhood which would have both aided in understanding the seriousness and origin of his mental illness and provided an understanding of Jermyn's relationship with the deceased. Moreover, it is clear that there was no psychiatric testimony discussing the effect of the childhood abuse on Jermyn's adult functioning, and how his mental illness mitigated against the imposition of death. Dr. Phillips' testimony during the guilt phase focused only on the question of insanity; he did not address how Jermyn's mental illness should impact the jury's sentencing determination.

We further point out that the Pennsylvania Supreme Court's conclusion that Jermyn had not been prejudiced by counsel's omissions appears to have been based in part on the fact that Jermyn's counsel had put *some* mitigating evidence before the jury, even though the jury did not hear the substance of what was uncovered at the PCRA hearing. *See Commonwealth v. Jermyn*, 709 A.2d at 859 (finding no prejudice "given all the mitigating evidence presented"). But the fact that counsel presented some mitigating evidence of a different nature and quality seems largely beside the point, given the significance of the evidence that was omitted and the reasonable likelihood that the totality of the available mitigating evidence (presented at trial and at the PCRA hearing) might have led to a different result. *See Williams*, 529 U.S. at 397–98, 120 S.Ct. 1495 (noting that state court unreasonably applied *Strickland* because it failed to evaluate "the totality of the available mitigation evidence" in reweighing it against evidence in aggravation). As the District Court correctly noted, the defendant in a capital case "has an [E]ighth [A]mendment right to present 'as a mitigating factor, any aspect of [the] defendant's character or record ... as a basis for a sentence less than death.'" *Jermyn v. Horn*, 1998 WL

---

**26.** We have not overlooked the fact that the lengthy V.A. records, which were sent out with the jury during the penalty phase, contained one reference to the fact that Jermyn's father beat him. Trial Tr. V.3, at 1000. But as the District Court pointed out, defense counsel prepared an index to the records that referenced *only* those portions of the records that documented Jermyn's diagnoses of paranoid schizophrenia. Realistically, assuming that the jury was satisfied with reviewing those portions of the records to which counsel referred, it would not have reviewed the records any further. Given that counsel did not highlight the fact that the records contained other mitigation evidence, and in light of the size of the records and the fact that most of the entries were handwritten and difficult to decipher, we agree with the District Court's supposition that it is distinctly possible, in fact quite probable, that the jury did not see that one reference to Jermyn's childhood beatings.

754567, at *14 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)). Here, Jermyn was denied that opportunity, and we believe that he was prejudiced thereby.

We have not overlooked the circumstance that Jermyn's counsel actually referred to his tormented childhood during his closing argument. In fact, implicit in the Pennsylvania Supreme Court's decision is the belief that because Jermyn's counsel placed the arguments Jermyn contends should have been presented in the minds of the jury during his closing argument, Jermyn cannot show that he was prejudiced. We cannot agree with this analysis. In line with the jury's duty to consider only the evidence presented to it, we do not believe that counsel's statements could have been given any substantial weight by the jury, as those arguments were not based upon facts developed in the evidence presented to the jury. In fact, as the District Court correctly pointed out, the trial court specifically instructed the jury that each individual juror's own recollection should control where there is a perceived discrepancy in the evidence. *Id.* at *16. Because we must presume that the jury followed the court's instructions, *United States v. Edmonds*, 80 F.3d 810, 825 (3d Cir.1996), we think it is fair to surmise that the jury placed no weight on counsel's unsupported statements.

Furthermore, as Pennsylvania is a weighing state, it is more than reasonable to believe that the weight given to any of the arguments made by counsel would reflect the evidence supporting the argument. Given that there was ample evidence that was not presented that would have supported the argument that Jermyn's life should be spared, we believe that there was a reasonable probability that a juror would find that the evidence presented at the PCRA hearing tipped the balance, and Jermyn would have been sentenced to life imprisonment instead of receiving the death penalty.

## IV.

For the foregoing reasons, we conclude that the District Court correctly denied Jermyn's petition as it related to the guilt-phase claims, but properly granted the writ insofar as it determined that Jermyn was entitled to a new penalty-phase hearing based upon counsel's ineffectiveness at that stage of the trial proceedings. "Given the severity of the potential sentence and the reality that [Jermyn's] life was at stake, ... we believe that it was [counsel's] duty ... to collect [and present] as much information as possible" for use at the penalty phase of the trial. *Hill v. Lockhart*, 28 F.3d 832, 845 (8th Cir.1994) (internal quotation marks omitted). Specifically, we hold that the District Court correctly determined that counsel's performance was deficient, and that the entire body of mitigating evidence that could have been presented raised a "reasonable probability that the result of the sentencing proceeding would have been different" if counsel had performed a reasonable investigation, presented the omitted evidence to the jury, and explained its significance at the penalty phase of Jermyn's trial. We therefore find that the Pennsylvania Supreme Court's decision "involved an unreasonable application" of the principles announced in *Strickland*, and that Jermyn is entitled to habeas relief under § 2254(d)(1).

We will therefore AFFIRM the District Court's Order entered October 27, 1998, in all respects.